**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| BRETT GAFFNEY, ANDREW WOLOZ, WILLIAM FORERO, individually and on behalf of all others similarly situated,<br>Plaintiffs,<br>v.<br>'47BRAND, LLC,<br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Brett Gaffney, Andrew Woloz, and William Forero ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, bring this Class Action Complaint against Defendant '47Brand, LLC ("Defendant" or "47Brand"). Plaintiffs allege the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiffs, which are alleged upon personal knowledge.

## NATURE OF THE ACTION

1. In recent years, federal courts across the country have warned that opaque digital-tracking practices pose a profound threat to Americans' privacy. The unauthorized collection of a person's browsing activity, website interactions, and device identifiers constitutes an invasion of the most basic expectation of privacy in one's online life. When a company affirmatively represents that users may control whether their data is sold, shared, or tracked, but then secretly sells, shares, and tracks that data anyway, the misconduct is especially egregious.

2. 47Brand is a premium sports lifestyle brand engaged in the design, manufacture, marketing, distribution, and sale of licensed headwear, apparel, and accessories for sports fans. 47Brand is an official licensee of Major League Baseball, the National Basketball Association, the National Football League, the National Hockey League, NASCAR, over 900 collegiate programs,

and many international football clubs. Through its commercial website, https://www.47brand.com (the "Website"), 47Brand provides consumers and sports fans with the ability to search for, navigate to, or otherwise browse and purchase licensed headwear and apparel, explore team and league collections, and access brand and company information. Via the Website, users browse and purchase licensed sports headwear and apparel across NFL, MLB, NBA, NHL, MLS, NCAA, and NASCAR collections; explore products organized by team, league, style, and sport; and access brand information including the company's history and loyalty rewards program. The Website places cookies and other third-party tracking technologies (the "Tracking Tools") capable of transmitting users' data on users' browsers the moment they visit the Website.

3. These Tracking Tools are owned and developed by analytics and social media companies, including Google, Meta, TikTok, Twitter, Reddit and Snapchat (collectively, the "Tracking Entities").

4. The Tracking Tools collect detailed interaction and behavioral data, including users' communicated requests to the Website for access to specific webpages, users' selection of buttons, and other on-page elements, as well as information entered into search fields. As a result, the Tracking Tools capture, duplicate, and generate new transmissions to the Tracking Entities containing the detailed URLs of webpages viewed; products viewed and/or purchased; inferred interests, preferences, location, or other characteristics based on users' behavior and content engagement; and personal, device, and technical identifiers such as device type, operating system, and browser type. The newly generated transmissions also include persistent identifiers, often contained within "cookies," that enable recognition of users across sessions and websites on the internet utilizing the same Tracking Tools. Collectively, this information is referred to herein as "Sensitive Information."

5. Like many modern websites, the Website displays a data cookie banner (the "Cookie Banner") and a privacy settings interface (the "Privacy Settings") purporting to give users meaningful control over what data the Website shares with third parties.

6. Defendant represents through its Privacy Settings that users can decline the use of and disable non-essential cookies used to track users and that users can outright reject the sale or sharing of their personal information. At the time Plaintiffs used the Website, these representations were false. Even after users declined non-essential cookies and/or rejected the sale or sharing of their personal information, the Website continued to place Tracking Tools from at least Reddit. After receiving Plaintiffs' initial demand letter, Defendant appears to have stopped post-opt-out tracking from Reddit on some date after March 24, 2026.

7. Misrepresenting the effectiveness of a tracking mechanism and users' ability to decline consent to the sharing of their Sensitive Information effectively deprives users of control over their Sensitive Information and violates fundamental privacy protections. In short, via the Website's Cookie Banner and Privacy Settings, Defendant materially misleads users about the use and sale of their data, lulling them into a false sense of security, privacy, and control while simultaneously enabling Tracking Entities to monitor, intercept, and transmit their online behavior in real time.

8. Defendant invaded Plaintiffs' fundamental right to privacy and fraudulently misrepresented the Website's data-collection practices by facilitating the Tracking Entities' unlawful interception of and intrusion into Plaintiffs' Sensitive Information. In doing so, Defendant violated the federal Wiretap Act, 18 U.S.C. § 2510, et seq.; California's Invasion of Privacy Act ("CIPA"), including Cal. Penal Code § 631 (illegal wiretapping); California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, et seq.; California's Unfair

Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq.; the California Constitution, Article 1, Section 1; New York's Deceptive Acts and Practices Act, N.Y. Gen. Bus. Law § 349; New York's false advertising law, N.Y. Gen. Bus. Law § 350; and common law, including invasion of privacy, intrusion upon seclusion, fraud, deceit, and/or misrepresentation, and unjust enrichment. Plaintiffs bring this action on behalf of themselves and a putative class of similarly situated persons who were harmed by Defendant's deceptive and unlawful surveillance practices.

## **JURISDICTION AND VENUE**

9. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the federal Wiretap Act, 18 U.S.C. § 2511(1). This Court has supplemental jurisdiction over the non-federal claims in this action. *See* 28 U.S.C. § 1367. This Court also has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of Class members is more than 100, and at least one member of the Class defined below is a citizen of a different state that is diverse from Defendant's citizenship. Thus, minimal diversity exists under 28 U.S.C. § 1332 (d)(2)(A).

10. This Court has personal jurisdiction over Defendant because Defendant is registered to do business in Massachusetts and maintains its principal place of business in this District.

11. Venue is proper in this Court because Defendant's principal place of business is located in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District. Lastly, the venue is proper in this District because Defendant is subject to this Court's personal jurisdiction with respect to this action.

## PARTIES

12. Plaintiff Brett Gaffney is, and at all relevant times has been, a citizen of the State of California and a resident of Los Angeles, California. Plaintiff Gaffney accessed and used Defendant's Website while physically located in Los Angeles, California. Plaintiff Gaffney maintains accounts with Facebook, Instagram, and TikTok. His social media accounts contain his identifying information, and he was logged into those accounts when he accessed the Website.

13. Plaintiff Andrew Woloz is, and at all relevant times has been, a citizen of the State of California and a resident of Studio City, California. Plaintiff Woloz accessed and used Defendant's Website while physically located in Studio City, California. Plaintiff Woloz maintains accounts with Facebook, Instagram, TikTok, LinkedIn, and X, and uses the same email address associated with his online shopping activity for those accounts. His social media accounts contain his identifying information.

14. Plaintiff William Forero is, and at all relevant times has been, a citizen of the State of New York and a resident of New York, New York. Plaintiff Forero accessed and used Defendant's Website while physically located in New York. Plaintiff Forero maintains accounts with Facebook, Instagram, Reddit, and X. He accessed the Website using Chrome, the same browser he uses to access Facebook, Instagram, and X, and he believes he was logged in to those accounts when he accessed the Website. His social media accounts contain his identifying information.

15. Defendant 47Brand is a for-profit corporation organized under the laws of the State of Massachusetts, with its principal place of business in Westwood, Massachusetts. 47Brand is a premium sports lifestyle brand that designs, manufactures, and markets licensed headwear and apparel, and operates its website located at https://www.47brand.com.

## FACTUAL ALLEGATIONS

### I. Plaintiffs' Experience On The Website

16. Plaintiff Gaffney visited Defendant's Website on or around January 23, 2026, to browse and purchase merchandise. When he visited the website using Safari, he was logged into his Facebook, Instagram, and TikTok on the same browser. On that occasion, Plaintiff Gaffney purchased a Kansas City Chiefs x San Francisco 49ers Super Bowl Gridiron Dueling '47 Tubular Tee and a Kansas City Chiefs Prime Play '47 Hitch RF Relaxed Fit cap from Defendant's Website. In connection with his visit in January 2026 to Defendant's Website, Plaintiff Gaffney was presented with the Website's Cookie Banner offering the option to "Manage Preferences." Plaintiff Gaffney does not recall specifically how he interacted with the banner on that occasion, but Plaintiff Gaffney regularly rejects cookies when presented with the opportunity to do so. Plaintiff Gaffney reasonably believed that his browsing activity would not be tracked beyond what was strictly necessary for the Website's basic functionality. Nonetheless, Defendant deployed third-party Tracking Tools that intercepted and recorded Plaintiff Gaffney's browsing activity, device identifiers, and related metadata, simultaneously transmitting the intercepted data to Tracking Entities. The intercepted communications disclosed the substance of Plaintiff Gaffney's communications with the Website, including the pages he chose to review, together with identifiers and related metadata. After visiting Defendant's Website, Plaintiff Gaffney noticed a dramatic increase in the number of advertisements for 47Brand he encountered on social media and other platforms.

17. Defendant's Tracking Tools intercepted and transmitted information concerning Plaintiff Gaffney's interactions with Defendant's Website to third-party Tracking Entities, including information concerning the pages and merchandise he viewed, together with associated

identifiers and metadata. As a result, Plaintiff Gaffney's information concerning his communications and interactions with Defendant's Website was intercepted and recorded without his knowledge or consent. Had Plaintiff Gaffney known that Defendant's Website would transmit information concerning his browsing and purchase activity to third parties, including for advertising purposes, he would not have navigated to, browsed, or used Defendant's Website.

18. Plaintiff Woloz visited Defendant's Website on or around November 2, 2025, and used the Website to browse and purchase merchandise. On that occasion, on or about November 2, 2025, Plaintiff Woloz purchased a Los Angeles Dodgers / Toronto Blue Jays MLB World Series Dueling '47 Franklin Tee from Defendant's Website for $126.00. In connection with his visit to Defendant's Website, Plaintiff Woloz was a current 47Brand Rewards member and logged into his account, where he held 835 loyalty points. Plaintiff Woloz consistently rejects the use of Tracking Tools on all websites he visits as a matter of personal privacy practice. In connection with his visit in November 2025 to Defendant's Website, Plaintiff Woloz was presented with the Website's Cookie Banner offering the option to "Manage Preferences." Plaintiff Woloz affirmatively toggled off all unnecessary cookies and similar technologies, in reliance on Defendant's representations that doing so would disable non-essential advertising, analytics, and tracking technologies. Plaintiff Woloz reasonably believed that his browsing activity would not be tracked beyond what was strictly necessary for the Website's basic functionality. Despite Plaintiff Woloz's rejection of non-essential tracking technologies, by toggling off unnecessary cookies, Defendant deployed third-party Tracking Tools that intercepted and recorded Plaintiff Woloz's browsing activity, device identifiers, and related metadata, and simultaneously transmitted the intercepted data to Tracking Entities. The intercepted communications disclosed the substance of Plaintiff Woloz's communications with the Website, including the pages he chose to review,

together with identifiers and related metadata. Plaintiff Woloz believed that his browsing and purchase activity was private. After visiting Defendant's Website, Plaintiff Woloz noticed advertisements for 47Brand on social media or other platforms.

19. During his visits to Defendant's Website, Plaintiff Woloz browsed product pages and related information concerning merchandise offered by Defendant. Defendant's Tracking Tools intercepted and transmitted information concerning Plaintiff Woloz's interactions with Defendant's Website to third-party Tracking Entities, including information concerning the pages and merchandise he viewed, together with associated identifiers and metadata. As a result, Plaintiff Woloz's information concerning his communications and interactions with Defendant's Website was intercepted and recorded without his knowledge or consent. Had Plaintiff Woloz known that Defendant's Website would transmit information concerning his browsing and purchase activity to third parties, including for advertising purposes, he would not have navigated to, browsed, or used Defendant's Website.

20. Plaintiff Forero visited Defendant's Website multiple times, including, most recently, on or around November 2025. Plaintiff Forero used the Website to browse and purchase merchandise. On one particular occasion, on or about May 15, 2024, Plaintiff Forero purchased a New York Islanders Crosstown Script '47 Hitch cap from Defendant's Website for $19.00 after seeing an ad on Instagram. In connection with his visit in November 2025 to Defendant's Website, Plaintiff Forero was presented with the Website's Cookie Banner offering the option to "Manage Preferences." Plaintiff Forero affirmatively toggled off all unnecessary cookies and similar technologies, in reliance on Defendant's representations that doing so would disable non-essential advertising, analytics, and tracking technologies. Plaintiff Forero reasonably believed that his browsing activity would not be tracked beyond what was strictly necessary for the Website's basic

functionality. Despite Plaintiff Forero's rejection of the non-essential tracking technologies, Defendant deployed third-party Tracking Tools that intercepted and recorded Plaintiff Forero's browsing activity, device identifiers, and related metadata, simultaneously transmitting the intercepted data to Tracking Entities. The intercepted communications disclosed the substance of Plaintiff Forero's communications with the Website, including the pages he chose to review, together with identifiers and related metadata. Plaintiff Forero believed that his browsing and purchase activity was private. After visiting Defendant's Website, Plaintiff Forero noticed advertisements for 47Brand on social media or other platforms.

21. During his visits to Defendant's Website, Plaintiff Forero browsed product pages and related information concerning merchandise offered by Defendant, including New York Islanders merchandise. Defendant's Tracking Tools intercepted and transmitted information concerning Plaintiff Forero's interactions with Defendant's Website to third-party Tracking Entities, including information concerning the pages and merchandise he viewed, together with associated identifiers and metadata. As a result, Plaintiff Forero's information concerning his communications and interactions with Defendant's Website was intercepted and recorded without his knowledge or consent. Had Plaintiff Forero known that Defendant's Website would transmit information concerning his browsing and purchase activity to third parties, including for advertising purposes, he would not have navigated to, browsed, or used Defendant's Website.

## II. How Websites Function

22. Websites are hosted on servers, in the sense that their files are stored on and accessed from servers. Websites are, in part, "run" on a user's internet browser, as the browser loads and processes the website's code to display the webpage.

23. Websites are a collection of webpages.[1] A webpage is essentially a document containing text written in HyperText Markup Language ("HTML") code.[2]

24. Each webpage has a unique address, and two webpages cannot be stored at the same address.

25. When a user navigates to a webpage (by entering a URL address directly or clicking a hyperlink containing the address), that user's browser contacts the Domain Name System ("DNS") server, which translates the web address of that website into a unique Internet Protocol ("IP") address.[3]

26. An IP address is "a unique address that identifies a device on the Internet or a local network."[4] In essence, an IP address is defined as follows:

> [T]he identifier that allows information to be sent between devices on a network: they contain location information and make devices accessible for communication. The internet needs a way to differentiate between different computers, routers, and websites. IP addresses provide a way of doing so and form an essential part of how the internet works.[5]

27. When a user's browser navigates to a webpage, it sends an HTTP request to the server identified by the webpage's IP address (the "Request URL"). This request is for the specific resource located at the URL. If the server fulfills this request, it issues an HTTP response that includes the request status and, typically, the requested content. This content is then transmitted in

---

[1] *See Browsing the Web*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/Web_mechanics/Pages_sites_servers_and_search_engines (last visited Sept. 30, 2026).

[2] *See id.*; *see also HTML: HyperText Markup Language*, MOZILLA, https://developer.mozilla.org/en-US/docs/Web/HTML (last visited Sept. 30, 2026).

[3] *See How the Web Works*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited Sept. 30, 2026).

[4] *What Is an IP Address – Definition and Explanation*, KASPERSKY, https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited Sept. 30, 2026).

[5] *Id.*

small chunks, known as data packets, and reassembled into the complete webpage by the user's browser upon arrival.[6]

28. This Request URL includes a domain name and path, which identify the specific content being accessed on a website and its location within the website's structure.

29. The Request URL typically contains parameters, values appended to a URL to transmit data to the recipient, prefaced by a question mark to signal their use, which direct the web server to provide additional, context-sensitive content.

30. By viewing a URL, an ordinary person can read these parameters and determine what choices a user made on a website, including the products or articles viewed, the phrases searched, and the substance of the user's communications with the website.

31. Website owners or web developers write and manage the URLs for their websites.

32. URL encoding is an essential process to ensure that data is safely transmitted via URLs. URL encoding converts characters into a format that can be transmitted over the Internet.

33. The American Standard Code for Information Interchange was designed in the early 1960s as a standard character set for computers and electronic devices.[7] Today, UTF-8 is the Internet's most common character encoding.[8]

34. After sending the Request URL, and after the server responds to the Request URL, the user's browser assembles the packets sent by the server back into the HTML code of the

[6] *See How the Web Works*, *supra* note 3.
[7] *See HTML ASCII Reference*, W3SCHOOLS, https://www.w3schools.com/charsets/ref_html_ascii.asp (last visited Sept. 30, 2026).
[8] *See UTF-8*, MOZILLA, https://developer.mozilla.org/en-US/docs/Glossary/UTF-8 (last visited Sept. 30, 2026).

webpage, which is then processed by the user's browser as it arrives,[9] and rendered into a visual display according to the instructions of the HTML code. This is the visible, and usually interactable, website that most people think of.[10]

35. To provide more complex website functionality, website developers will include more complex commands written in other computer programming languages, such as JavaScript snippets, within the HTML documents.[11]

36. Such complex tasks include code used to monitor and report users' activity. This code intercepts users' communications while they are in transit to a website, while a URL is being requested, and duplicates those requests, transmitting them to a first- or third-party server.

37. In short, the Internet relies on a constant back-and-forth stream of requests and responses between a user's browser and a website's stored code and data. Importantly, the requests and responses provide a perfect snapshot of everything a user does (or does not do) on a website, when and how they do it, and with what software and hardware.

38. Unbeknownst to users, as they browse the Website, the Tracking Tools, including third- and first-party cookies, capture and record both incoming and outgoing requests and responses that make up their entire experience on the Website.

---

[9] *See Populating the Page: How Browsers Work*, MOZILLA, https://developer.mozilla.org/en-US/docs/Web/Performance/Guides/How_browsers_work (last visited Sept. 30, 2026). This processing of webpage data as it arrives is called "parsing," and allows web browsers to convert raw data received over the internet into structured data objects used by the renderer built into the browser to create images on the screen. *See Parse*, MOZILLA, https://developer.mozilla.org/en-US/docs/Glossary/Parse (las visited Sept. 30, 2026). In short, unless a software command, like a Tracking Tool, is physically last to arrive at a device, it is loaded and executed before the communication has finished being received.

[10] *See What Is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn_web_development/Howto/Web_mechanics/What_is_a_URL (last visited Sept. 30, 2026).

[11] *See JavaScript: Adding Interactivity*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/JavaScript_basics (last visited Sept. 30, 2026).

## III. Defendant Programmed the Website To Identify and Track Users

39. Defendant voluntarily integrated Tracking Tools from various Tracking Entities into its Website's programming. Defendant's use of such tools on its Website is performed pursuant to commercial agreements between Defendant and third parties, including Tracking Entities.

40. Central to this process are cookies, small text files sent by a website's server to a user's browser and stored locally on their device. Cookies contain unique identifiers that enable websites and third parties to recognize and differentiate individual users, and that are automatically transmitted back to web servers through HTTP requests, allowing the Website and third parties to record everything a user views, clicks, types, or hovers over during a session.

41. First-party cookies are placed directly on Plaintiffs' devices by Defendant's Website and are used to recognize Plaintiffs across repeated visits and track their on-site activity. Third-party cookies, by contrast, are placed by external domains, such as google.com and other advertising or analytics platforms. When Plaintiffs' browsers load webpages containing cookies and Tracking Tools, the Tracking Entities' scripts determine whether their cookies already exist on the user's device and, if not, cause those cookies to be stored. These third-party cookies enable the Tracking Entities to recognize and track Plaintiffs not only on the Website, but across entirely different websites and multiple browsing sessions.

42. As detailed further below, Tracking Tools, including first- and third-party cookies, that are placed on users' devices during interactions with the Website are subsequently used to intercept and record users' communications by the Tracking Entities, enabling them to surreptitiously track and collect Website users' Sensitive Information in real time.

43. Tracking Tools serve numerous commercial purposes, including: (i) analytics, such as measuring user engagement and Website performance; (ii) personalization, including remembering user preferences; (iii) advertising and targeting, including delivering targeted or behavioral advertisements based on user profiles; and (iv) social media integration. Ultimately, Tracking Tools enable Defendant and Tracking Entities to earn more money and enhance marketing effectiveness through the collection, analysis, and dissemination of users' Sensitive Information, especially as users' Sensitive Information is used to build detailed marketing profiles of users to enhance the effectiveness and efficiency of Tracking Entities' and Defendant's marketing efforts.

44. Defendant controls the Website's software code and determines which Tracking Tools are loaded onto users' browsers. Defendant configured the Website to place both first- and third-party cookies on Plaintiffs' browsers upon accessing the Website, allowing the Tracking Entities to identify and monitor Plaintiffs' activity.

## IV. The Website Misrepresented That Users Could Control the Collection and Disclosure of Their Sensitive Information

45. Defendant displayed a Cookie Banner and Privacy Settings on the Website. The Cookie Banner and Privacy Settings represented that users could make material choices about what tools were used on the website and how their data was shared with third parties. Plaintiffs relied on these representations when using the Website. However, these representations were materially false and misleading.




*Figure 1 – The Website's Cookie Banner and Privacy Settings, representing that users could change the Website's tracking behavior*




*Figure 2 – The Website's Cookie Banner and Privacy Settings, representing that users could change the Website's tracking behavior (image 2)*




*Figure 3 – The Website's Cookie Banner and Privacy Settings, representing that users could change the Website's tracking behavior (image 3)*

46. When users visited the Website, the Website immediately displayed the Cookie Banner that stated:

> This website utilizes technologies such as cookies to enable essential site functionality, as well as for analytics, personalization, and targeted advertising. To learn more, view the following link: Privacy Policy.[12]

47. The Cookie Banner presents users with options to "Manage Preferences." Upon selecting "Manage Preferences" or "X" the Cookie Banner disappears from view.

48. Website users who select the "Manage Preferences" option are presented with the Privacy Settings, which represented that users can control and limit how their Sensitive

[12] *Figure 1.*

Information is collected and shared by disabling the use of non-essential cookies and also by rejecting the sale or sharing of their personal information.

49. After users click the "Save" or "X" button, the Privacy Settings window disappeared.

50. Defendant's explanation as to its use of Tracking Tools on the Website is contained in the Privacy Settings:

> When you visit websites, they may store or retrieve data about you using cookies and similar technologies ("cookies"). Cookies may be necessary for the basic functionality of the website as well as other purposes. You have the option of disabling certain types of cookies, though doing so may impact your experience on the website.[13]

51. The Privacy Settings state that users can decline non-essential cookies, including targeted advertising, personalization, and analytics cookies, which may impact their experience on the Website.

52. The Privacy Settings represent that "Essential Cookies" are required for the Website to function:

> Essential
> Required to enable basic website functionality. You may not disable essential cookies.[14]

53. The Privacy Settings describe "Targeted Advertising" cookies as being used to deliver personalized advertising and are placed by advertising networks:

> Targeted Advertising
> Used to deliver advertising that is more relevant to you and your interests. May also be used to limit the number of times you see an advertisement and measure the effectiveness of advertising campaigns. Advertising networks usually place them with the website operator's permission.[15]

---

[13] *Figure 2.*
[14] *Id.*
[15] *Id.*

54. The Privacy Settings describe "Personalization" cookies as being used to remember choices users make:

> Personalization
> Allow the website to remember choices you make (such as your username, language, or the region you are in) and provide enhanced, more personal features. For example, a website may provide you with local weather reports or traffic news by storing data about your general location.[16]

55. The Privacy Settings inform users that "Analytics" cookies are used to understand website performance and record user interactions:

> Analytics
> Help the website operator understand how its website performs, how visitors interact with the site, and whether there may be technical issues.[17]

56. Finally, the Privacy Settings represent that users could entirely stop the sale and sharing of personal information:

> Do Not Sell or Share My Personal Information
> By switching the toggle to the right and clicking save, you are indicating that you do not want us to sell your personal information or share your personal information for online targeted advertising activities. Please note if you use different computers or browsers, you must indicate your choices again on each computer or browser used to access our services.[18]

57. Defendant's Privacy Settings clearly informed Plaintiffs that their detailed browsing activity and interactions with the Website would not be captured and transmitted to Tracking Entities via the Tracking Tools, which are capable of aggregating and monetizing that information across multiple websites, when they affirmatively rejected the sale and sharing of their personal information and consented only to essential cookies.

58. The representations made by Defendant in the Cookie Banner and Privacy Settings led Plaintiffs, and would reasonably lead all Website users similarly situated, to believe that they

---

[16] *Figure 2.*
[17] *Id.*
[18] *Figure 3.*

had successfully disabled all but strictly essential cookies via their express rejection. The Cookie Banner and Privacy Settings further reasonably led Plaintiffs and all reasonable users to believe that, if they opted out, Defendant would not allow Tracking Entities, through cookies or similar technologies, to access users' Sensitive Information. Plaintiffs acted on those representations by interacting with the Website after making privacy selections intended to reject any sharing of their personal information and use of any non-essential cookies.

59. These representations were false. Defendant did not abide by Plaintiffs' or users' expressed preferences, and in fact began tracking users before they could interact with the Cookie Banner or the Privacy Settings.

60. When users choose to decline all non-essential cookies, they clearly communicate that they do not consent to the placement or transmission of cookies other than those required for functionality.

61. The Tracking Tools that Defendant caused to be loaded and executed by users' browsers function as an unlawful wiretap, pen register, and trap and trace device when executed because they enabled Tracking Entities, separate and distinct parties from Defendant, to eavesdrop on, record, extract, analyze, and exploit users' Sensitive Information. The Tracking Entities are not mere passive tools or instruments of Defendant; they collect, analyze, and use the intercepted communications for their (and Defendant's) monetary gain.

**V. Defendant's Website Uses Tracking Tools**

62. Defendant operates the Website and has installed Tracking Tools on the Website created by Tracking Entities, including Google, Meta, TikTok, Twitter, Reddit and Snapchat.

63. The Tracking Tools operate invisibly, intercepting Plaintiffs' Sensitive Information as it arrives at or is sent from their devices, copying the contents of those communications, and

generating new Request URLs that are transmitted to the Tracking Entities. This process is entirely surreptitious. Users are given no indication that their interactions are being captured and transmitted in real time.

64. Generally, the Tracking Tools function by intercepting users' communications, including Plaintiffs' Sensitive Information, in transit when they take certain actions on the Website. These actions include when they click on a link, make a search, view or purchase a product or load any page on the Website.

65. The Tracking Tools also collect information tied to specific user interactions, or "events," defined and configured by Defendant, such as loading a webpage or adding a product to a shopping cart. Defendant further controls the scope of data collected by adding parameters to these events. Parameters are strings of text appended to a URL in key-value pairs formatted as "key=value": the "key" identifies what is being tracked (e.g., "ev" for event type), and the "value" captures the specific data associated with that interaction (e.g., "AddToCart"). By adjusting these parameters, Defendant determines precisely how much data is collected by the Tracking Entities and at what level of granularity.

66. The Tracking Tools use cookies and other identifiers to identify users, including Plaintiffs, when they visit the Website, regardless of whether users made an account or purchase on the Website. The cookies allow the Tracking Entities to identify users, including Plaintiffs when they visit the Website or any other website where the Tracking Tools are present.

67. The Tracking Tools allow Defendant and the Tracking Entities to materially benefit from Plaintiffs' Sensitive Information. Defendant uses Plaintiffs' Sensitive Information to improve its marketing and advertising effectiveness and efficiency, while the Tracking Entities use Plaintiffs' Sensitive Information to sell marketing and advertising services to the Website and other

third-party websites, improve their own services by, among other things, enhancing the algorithms used to process data intercepted by their Tracking Tools, and to build personal profiles to improve the effectiveness of advertising targeted at users, including Plaintiffs.

## VI. The Meta Pixel

68. Meta offers its own tracking pixel (the "Meta Pixel") to website owners for the purpose of monitoring user interactions on their websites, which can then be shared with Meta.

69. The Meta Pixel is a marketing tool that can only be added to a webpage by website developers.[19] A website operator must sign up for a business account or link a related Facebook account to its Pixel, then add code to the website to use the Pixel.[20]

70. Upon creating a Pixel, a Pixel ID is generated.[21] This Pixel ID is used to initialize the Meta Pixel, either by allowing Meta to fetch a predetermined library of code related to that ID, or otherwise by identifying the website owner's Facebook account used to receive the collected data when programming the Pixel directly into a website.[22]

71. This Pixel ID must match a known Pixel ID in Meta's system, and is transmitted by the Meta Pixel.[23]

72. As Meta notes, the Meta Pixel must be added to each individual page that a website owner wishes to be tracked.[24]

---

[19] *See Setup and Install the Meta Pixel*, META, https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited Sept. 30, 2026).

[20] *See id.*

[21] *Get Started with the Meta Pixel*, META (JUNE 30, 2026), https://developers.facebook.com/docs/meta-pixel/get-started/.

[22] *See id.*

[23] *See id.*

[24] *See id.* ("To install the Pixel, . . . add its base code . . . on every page where you will be tracking website visitor actions.").

73. The Meta Pixel is employed by Defendant to gather, intercept, and then share user information with Meta. Receiving this information enables Meta and Defendant to build valuable personal profiles for Website users to inform their targeted advertising campaigns, enhancing marketing effectiveness and increasing the chance of converting users into paying customers.[25]

74. The harvested data improves Defendant's advertising by pinpointing audience demographics across interests, gender, or location, and finding the people who are most likely to take action and view content.[26]

75. Once implemented on a website, the Meta Pixel begins to share users' information the moment a user lands on the website.

76. When a Facebook account holder logs onto Facebook, tracking cookies, including the c_user cookie, the data cookie, and the fr cookie, are automatically created and stored on the user's device. These cookies allow Meta to link the data it receives through the Meta Pixel to individual Facebook account holders.[27]

77. The c_user cookie, for example, contains a series of numbers (the user's Facebook ID, or "FID") to identify a user's profile.

---

[25] *See id.* The Meta Pixel allows websites to track user activity by monitoring user actions ("events") that websites want tracked and share a tracked user's data with Facebook. *See Specifications for Meta Pixel standard events*, META, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited Sept. 30, 2026).

[26] *See Meta Advantage+ Audience: Target Ad Campaigns with AI*, META, https://www.facebook.com/business/ads/meta-advantage-plus/audience (last visited Sept. 30, 2026).

[27] *See Meta Cookies Policy*, META (Dec. 12, 2023) https://www.facebook.com/policy/cookies/ (last visited Sept. 30, 2026).

78. A user's Facebook profile publicly displays, at minimum, their age range, language, country, name, profile picture, username, and user ID.[28]

79. The Meta Pixel tracks user activity on web pages by monitoring events, which, when triggered, cause the Meta Pixel to automatically send data—here, users' Sensitive Information—directly to Meta. For example, when a user loads a page with a Pixel installed (the "PageView event"), the Website utilizes this PageView event.[29]

80. Defendant's use of the Meta Pixel also transmits its unique Pixel IDs via the "id" parameter, which contains Defendant's Pixel ID of "331556748242190."

81. Defendant and Meta use the Meta Pixel to monetize Website Plaintiffs' and similarly situated users' Sensitive Information.

82. Meta independently benefits from the data collected through the Meta Pixel by using the harvested data to sell targeted advertising services. Through the use of users' Sensitive Information, Meta refines its marketing algorithms, profiting from the ability to more accurately target potential customers. Defendant then makes use of Meta's refined marketing profiles to target users with advertising.

83. Meta admits that it shares users' Sensitive Information with third parties, just as Plaintiffs' Sensitive Information was shared here.[30]

84. Defendant's concealed use of the Meta Pixel on the Website is demonstrated by the screenshots below, which show a user viewing a sample product on the Website.

---

[28] *See Control Who Can See What You Share on Facebook*, META, https://www.facebook.com/help/1297502253597210 (last visited Sept. 30, 2026).

[29] *See Conversion Tracking*, META (June 30, 2026) https://developers.facebook.com/documentation/meta-pixel/implementation/conversion-tracking.

[30] *See Privacy Policy*, META (July 23, 2026) https://www.facebook.com/privacy/policy?section_id=4-HowDoWeShare (last visited Oct. 16, 2026).




*Figure 4 – The Meta Pixel intercepting a sample user’s communication on the Website*




*Figure 5 – Information captured when the Meta Pixel intercepts a user’s communication on the Website*



Headers Payload Preview Response Initiator Timing Cookies

**Request Cookies** show filtered out request cookies

| Name | Value | Domain | Path | Expires / Max-... | Size | HttpOnly | Secure | SameSite |
|---|---|---|---|---|---|---|---|---|
| ar_debug | 1 | .facebook.com | / | Session | 9 | ✓ | ✓ | None |
| c_user | [redacted] | .facebook.com | / | 2027-02-02T1... | 21 | | ✓ | None |
| datr | iux8ad9qA3R... | .facebook.com | / | 2027-03-06T1... | 28 | ✓ | ✓ | None |
| fr | 1kilWMYRQX... | .facebook.com | / | 2026-05-03T1... | 122 | ✓ | ✓ | None |
| sb | iux8aT2ShZ7_... | .facebook.com | / | 2027-03-06T1... | 26 | ✓ | ✓ | None |
| xs | 27%3AmAehZ... | .facebook.com | / | 2027-02-02T1... | 96 | ✓ | ✓ | None |

**Response Cookies**

| Name | Value | Domain | Path | Expires / Max-... | Size | HttpOnly | Secure | SameSite |
|---|---|---|---|---|---|---|---|---|
| ar_debug | 1 | .facebook.com | / | Session | 73 | ✓ | ✓ | None |

*Figure 6 – Cookies transmitted to and from the Meta Pixel on the Website*

85. When a business applies with Meta to use the Meta Pixel, it is provided details about its functionality, including with respect to Sensitive Information.[31]

86. To make use of the Meta Pixel, Defendant agreed to Meta's Business Tool Terms (the "Meta Terms").

87. The Meta Terms inform website owners using Meta's Pixel that the employment of the Meta Pixel will result in data sharing, including with Meta, through the automatic sharing of Pixel Event information and contact information.[32]

88. The Meta Terms are transparent that Meta will use the Pixel Event information and contact information "to match the contact information against visitor IDs…, as well as to combine those user IDs with corresponding Event Data."[33]

---

[31] *See Get started with the Meta Pixel*, *supra* note 21 (The Meta Pixel "relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook User accounts. Once matched, we can tally their actions in the Facebook Ads Manager so you can use the data. . . . By default, the Pixel will track URLs visited [and] domains visited.").

[32] *See Meta Business Tools Terms*, META (Nov. 3, 2025) https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGodnMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr.

[33] *Id.*

89. Meta directs parties implementing the Meta Pixel, such as Defendant, to encrypt request information before data can be shared.[34]

90. Meta further provides Meta Pixel users, such as Defendant, guidance on responsible data handling and details how data is acquired, used, and stored, including which information is shared with Meta.

91. Meta educates or reminds Meta Pixel users, such as Defendant, of their responsibility to inform their users of their website's data sharing practices and specifically guides website owners to obtain the requisite rights, permissions, or consents before sharing information with any Tracking Entities.[35]

92. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Meta Pixel and ignored Meta's warnings to safely handle its users' data and to warn its users that the Website would disclose information in a manner that threatened users' Sensitive Information.

## VII. The TikTok Pixel

93. TikTok offers software known as a "tracking pixel" to track users' actions, behavior, and conversions across the Website (the "TikTok Pixel").

94. The TikTok Pixel is a snippet of code that begins to collect user information the moment a user lands on the Website, before Defendant's Cookie Banner or Privacy Settings

[34] This contrasts with Facebook's JavaScript Pixel, which automatically encrypts the data being sent. *See id.* Defendant has specifically chosen the Facebook Pixel method, which makes users' information visible.

[35] *See Privacy and Data Use for Meta Business Tools*, META, https://www.facebook.com/business/help/363303621411154?id=818859032317965 (last visited Sept. 30, 2026).

advises the user of the invasion or seeks their consent. To use the TikTok Pixel, website operators must include the specific pixel IDs associated with their websites, which allows TikTok to link the collected data back to their individual TikTok business profiles.[36]

95. Defendant's TikTok Pixel ID is included in transmissions sent to and from users' devices. The TikTok JavaScript code and the "code" variable in the TikTok payload both identify the Pixel ID as "CMP7RKRC77U58IEMSAU0."

96. TikTok Pixel users make use of events to collect even more specific data on users' activities, including actions taken on a webpage (e.g., clicking a specific button or element, adding an item to a cart, and when a webpage with a URL containing a specified keyword is loaded onto a user's browser), the value of the purchase, and the product purchased.[37]

97. These event-triggers cause data to be sent as communications are received by users (through webpage loading events), and as communications are sent to the Website (through button clicking and similar events).

98. The TikTok Pixel also collects:

- The time website actions took place;
- The IP address (which is used to determine the geographic location of a user);
- Device information, including make, model, operating system, and browser information; and

[36] *See generally About TikTok Pixel*, TIKTOK (last updated June 2026) https://ads.tiktok.com/resources/help/article/tiktok-pixel?lang=en; *Troubleshoot with Pixel Helper*, TIKTOK (last updated Feb. 2025) https://ads.tiktok.com/help/article/tiktok-pixel-helper-2.0?lang=en.

[37] *See How to set up events and parameters with Events Builder*, TIKTOK (last updated Aug. 2025) https://ads.tiktok.com/help/article/how-to-set-up-events-and-parameters (describing how to designate events).

- Metadata and button clicks.[38]

99. The information the TikTok Pixel collects provides Defendant and TikTok with a better understanding of who Defendant's customers are and how they navigate around the Website.

100. TikTok's "Advanced Matching" features allow Defendant to "match customer information such as email, phone number, and other identifiers with actions people take on [the Website]."[39] Once Advanced Matching is active, the TikTok Pixel "will automatically find customer information and match it with people on TikTok."[40] If Automatic Advanced Matching is not enabled, the TikTok Pixel uses Manual Advanced Matching. To enable Manual Advanced Matching, website owners "[m]anually control which Advanced Matching parameters you share with TikTok" and can choose exactly what information is shared with TikTok.[41] Through either method, TikTok then provides Defendant with custom audiences based on website user events, like page views or purchases, to model lookalike audiences. Lookalike audiences allow Defendant to retarget users who have already visited or made purchases on the Website and serve them with relevant ads on TikTok based on how they interacted with the Website.

101. Put simply, the TikTok Pixel collects as much data as it can about otherwise anonymous visitors to the Website and matches it with existing data TikTok has acquired and accumulated about over one billion active monthly users to improve Defendant's conversion rates and reduce overall advertising costs.[42]

---

[38] *See About TikTok Pixel*, *supra* note 36.
[39] *About Advanced Matching for Web*, TIKTOK (last updated Sept. 2025) https://ads.tiktok.com/help/article/advanced-matching-web?lang=en.
[40] *How to Set Up Automatic Advanced Matching*, TIKTOK (last updated Nov. 2025) https://ads.tiktok.com/help/article/how-to-set-up-automatic-advanced-matching?lang=en.
[41] *About Advanced Matching for Web*, TIKTOK (last updated Sept. 2025) https://ads.tiktok.com/help/article/advanced-matching-web?lang=en.
[42] *See* Lizzie Davey, *How to Use TikTok Pixel: TikTok Conversions Tracking*, LEADSBRIDGE (May 2, 2025) https://leadsbridge.com/blog/tiktok-pixel/.

102. Defendant used the TikTok Pixel to monitor and log, in real time, when users clicked on specific products, loaded webpages, added specific products to cart, and proceeded through the checkout process to payment and shipping.

103. The TikTok Pixel also captures users' identifying cookies (the _ttp cookie is used to identify TikTok users.)[43]

104. Plaintiffs had a reasonable expectation that their Sensitive Information, including (i) Plaintiffs' identifying information, (ii) information that designated Plaintiffs as interested in purchasing or otherwise as purchasers of Defendant's products, and (iii) IP addresses and identifier information relating to who Plaintiffs are and who Plaintiffs were communicating with to obtain the products, would not be exposed to the Tracking Tools placed by Defendant.

105. Using the TikTok Pixel benefits Defendant by allowing Defendant to effectively track conversions, optimize the delivery of its ad campaigns, create and target its own custom audiences, and access tons of data to run successful ad campaigns.[44]

106. TikTok benefits, in turn, by using data collected by the TikTok Pixel to improve its own products and services and to generate its own benchmarking reports to share with other TikTok business customers.[45]

---

[43] *See List of Cookies*, G-STAR RAW 13 (March 2023) https://assets.g-star.com/v1/static/Cookielist_Jun_2022#:~:text=Tiktok%20tta_attr_id.%2012%20months%20This%20cookie%20is,measure%20how%20different%20campaigns%20and%20marketing%20strategies (last visited Oct. 16, 2026).

[44] *See Get Started with the TikTok Pixel: A Small Business Guide*, TIKTOK, https://ads.tiktok.com/business/en-US/blog/get-started-with-tiktok-pixel?acq_banner_version=73412989 (last visited Sept. 30, 2026).

[45] *See TikTok Business Products (Data) Terms*, TIKTOK (Jan. 22, 2026) http://ads.tiktok.com/i18n/official/policy/business-products-terms.

107. In fact, TikTok admits that it gathers Website visitors' Sensitive Information via the TikTok Pixel and shares that Sensitive Information with third parties, just as Plaintiffs' Sensitive Information was gathered and shared here.[46]

108. According to a leading data security firm, the TikTok Pixel secretly installed on Defendant's Website is particularly invasive. The TikTok Pixel "immediately link[s] to data harvesting platforms that pick off usernames and passwords, credit card and banking information and details about users' personal health."[47] The TikTok Pixel also collects "names, passwords and authentication codes" and "transfer[s] the data to locations around the globe," and does so "before users have a chance to accept cookies or otherwise grant consent."[48]

109. An image of the invasive TikTok code secretly embedded on Defendant's Website is below, showing the Website instantly sending communications to TikTok to add to its collection of user behavior:

[46] *See Privacy Policy*, TIKTOK (July 15, 2026) https://www.tiktok.com/legal/page/us/privacy-policy/en.

[47] *See* Aaron Katersky, *TikTok Has Your Data Even If You've Never Used The App: Report*, ABC NEWS (Mar. 16, 2023, 1:59 PM) https://abcnews.go.com/Business/tiktok-data-app-report/story?id=97913249.

[48] *Id.*



*Figure 7 – Defendant's TikTok Pixel code on the Website displaying the active features of the TikTok Pixel on the Website*

110. The Website instantly sends communications to TikTok when a user views the page and tracks page interactions, as shown in the screenshots below:



*Figure 8 – TikTok intercepting a user's communication on the Website*



*Figure 9 – Information captured by TikTok intercepting a user's communication on the Website*

111. To use the TikTok Pixel, Defendant agreed to TikTok's Business Products (Data) Terms (the "TikTok Terms"). However, Plaintiffs and those similarly situated were never exposed to these terms (nor would they have any reason to look for them), as they form the agreement between Defendant and TikTok, which agreement is not even known to Plaintiffs or Website users.

112. The TikTok Terms inform website owners using the TikTok Pixel, such as Defendant, that their use of the TikTok Pixel shares or enables TikTok to access their website users' contact details, developer data, and/or event data.[49]

113. The TikTok Terms are transparent that TikTok will process users' data to match contact details against corresponding accounts and subsequently match those accounts with the users' corresponding event data.[50]

114. TikTok obligates TikTok Pixel users, such as Defendant, that they "must only share with us or enable us to access Business Products Data in a manner that is transparent and lawful."[51] TikTok makes clear that the onus is on Defendant to provide all necessary transparency notices, and obtain all necessary rights, permissions, and lawful bases, including consent, to share information with TikTok.

115. TikTok educates or reminds TikTok Pixel users of their obligation not to share any data "from or about Children or that includes health or financial information, or other categories of Sensitive Information."[52]

116. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the TikTok Pixel and ignored TikTok's warnings to safely handle its users' data and warn their users that the Website would disclose their Sensitive Information in a manner that impinges upon their privacy.

---

[49] *See TikTok Business Products (Data) Terms*, *supra* note 45.
[50] *Id.*
[51] *Id.*
[52] *Id.*

## VIII. The Twitter Pixel

117. X Corp. f/k/a Twitter ("Twitter") also offers its own website tag that can be implemented into websites to track users' site actions or conversions (the "Twitter Pixel").

118. To make use of the Twitter Pixel, website owners, such as Defendant, must take several affirmative steps: they must generate the Twitter Pixel and create events to track, implement the Twitter Pixel base code across their website, and implement event code in key locations on their website, like when a user makes a purchase.[53]

119. With each event, website owners like Defendant can select the user action they want to track and the parameters to share about the action.

120. Events can include viewing a page, making a purchase, adding an item to the shopping cart, using the search bar, adding a product to the wish list, adding payment information, and customizing a product.[54]

121. Parameters can include the contents of the action, the search terms used on the website, the email address of the user taking the action, the value of the product purchased, and the currency the purchase was made in.[55]

122. As soon as the Twitter Pixel is placed on a website, it begins to collect information, including the cookie IDs of users, to match them to Twitter users for the purpose of developing custom audiences to market and advertise to.[56]

---

[53] *See Conversion Tracking for Websites*, X HELP CENTER, https://business.x.com/en/help/campaign-measurement-and-analytics/conversion-tracking-for-websites (last visited Sept. 30, 2026).

[54] *See id.*

[55] *See id.*

[56] *See Website Activity Custom Audiences*, X HELP CENTER, https://business.x.com/en/help/campaign-setup/campaign-targeting/custom-audiences/website-activity (last visited Sept. 30, 2026).

123. Twitter admits that it shares users' Sensitive Information with third and fourth parties, just as Plaintiffs' Sensitive Information was shared here.[57]

124. Twitter allows website owners, such as Defendant, to create "Website Activity Audiences," a type of custom audience, which enables Twitter to collect and analyze user activity for users who have visited or taken certain actions on Defendant's Website.[58] Once an audience is created and the Twitter Pixel collects 100 Twitter users, the audience will be ready to use for targeting in ad campaigns.

125. The data collected by the Twitter Pixel informs both Defendant and Twitter how to optimally target custom audiences with advertising based on the "geo[graphy], gender, age, and device targeting criteria" specified by Defendant.[59]

126. During counsel's pre-suit investigation of the Website, an image of the invasive Twitter code secretly embedded on Defendant's Website can be seen here:




*Figure 10 – Twitter intercepting a user's communication on the Website*

---

[57] *See X Privacy Policy*, X (Jan. 15, 2026) https://x.com/en/privacy.
[58] *See Website Activity Custom Audiences*, *supra* note 56.
[59] *Id.*

× Headers **Payload** Preview Response Initiator Timing Cookies

▾ **Query String Parameters** View source View URL-encoded

| | |
|---|---|
| bci | 3 |
| dv | America/New_York&en-US,en&Google Inc.&Win32&255&1920&1080&16&24&1920&1080&0&na |
| eci | 2 |
| event_id | 4f19e330-c861-468a-a82d-37958f1cd286 |
| events | [["pageview",{}]] |
| integration | advertiser |
| p_id | Twitter |
| p_user_id | 0 |
| pl_id | ba64cd72-b087-4b43-ba5f-4a92470710d0 |
| pt | Los Angeles Dodgers '47 CLEAN UP \| The Original Dad Hat \| '47 |
| tw_document_href | https://www.47brand.com/web-pixels@3918e4e0wbf3ac3cepc5707306mb02b36c6/custom/web-pixel-43483208@4/sandbox/modern/products/los-angeles-dodgers-47-clean-up?variant=39443773358152 |
| tw_iframe_status | 1 |
| tw_order_quantity | 0 |
| tw_sale_amount | 0 |
| txn_id | nw2w5 |
| type | javascript |
| version | 2.3.35 |

*Figure 11 – Information captured by Twitter intercepting a user's communication on the Website*

× Headers Payload Preview Response Initiator Timing **Cookies**

**Request Cookies** ☐ show filtered out request cookies

| Name | Value | Domain | Path | Expires / M... | Size | HttpOnly | Secure | SameSite |
|---|---|---|---|---|---|---|---|---|
| __cf_bm | T4oYiDX0t... | .twitter.com | / | 2026-02-0... | 177 | ✓ | ✓ | None |
| guest_id | v1%3A176... | .twitter.com | / | 2027-03-0... | 31 | | ✓ | None |
| guest_id_ads | v1%3A176... | .twitter.com | / | 2027-03-0... | 35 | | ✓ | None |
| guest_id_m... | v1%3A176... | .twitter.com | / | 2027-03-0... | 41 | | ✓ | None |
| personaliza... | "v1_zSfvieR... | .twitter.com | / | 2027-03-0... | 47 | | ✓ | None |

**Response Cookies**

| Name | Value | Domain | Path | Expires / M... | Size | HttpOnly | Secure | SameSite |
|---|---|---|---|---|---|---|---|---|
| __cf_bm | gSjGUtzunl... | .twitter.com | / | 2026-02-0... | 205 | ✓ | ✓ | ⓘ |

*Figure 12 – Cookies transmitted to and from Twitter on the Website*

127. To use the Twitter Pixel, Defendant agreed to Twitter's policies for conversion tracking and custom audiences (the "Twitter Terms").

128. The Twitter Terms are transparent that Twitter will process users' data to match contact details against corresponding accounts, and subsequently match those accounts with the users' corresponding event data.[60]

129. Twitter obligates Twitter Pixel users, such as Defendant, that they "must provide their application customers with legally sufficient notice that they are working with third parties to collect customer data through their application for purposes of conversion tracking and serving ads targeted to customers' interests, and obtain legally sufficient consent from their customers for these activities."[61]

130. Twitter makes clear that the onus is on Defendant to provide all necessary transparency notices, and obtain all necessary rights, permissions, and lawful bases, including consent, to share information with Twitter.

131. Twitter educates or reminds Twitter Pixel users of their obligation to be honest with their consumers and not to select "targeting criteria that could reveal sensitive information about consumers."[62]

132. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Twitter Pixel, and ignored Twitter's warnings to safely handle its users' data and warn its users that the Website would disclose their information in a manner that threatened their sensitive information

---

[60] *See Policies for Conversion Tracking and Custom Audiences*, X HELP CENTER, https://help.x.com/en/business-and-advertising/policies-for-conversion-tracking-and-custom-audiences (last visited Sept. 30, 2026).
[61] *Id.*
[62] *Id.*

## IX. Google Ads

133. Google Ads, formerly AdWords, is an advertising platform developed by Google that allows advertisers to bid to display advertisements, service offerings, product listings, or videos to web users.[63]

134. The process for advertisers using Google Ads to display ads within Google search results is as follows: (i) advertisers create text-based ads with a title, description, and a link to the website to place within the Google search results; (ii) advertisers then choose keywords, usually related to their business or target audience, intended to trigger their ads to appear within the user's search results; (iii) Google then allows advertisers to bid on those various keywords; (iv) the advertiser with the highest bid wins the auction, and the ad is displayed on the search results page; and (v) the winning ad appears above or below the organic search results and is marked as an ad.[64]

135. Google AdSense works in conjunction with the Google Ads bidding system and allows website owners, like Defendant, to display Google Ads on their websites and earn a revenue share when ads are viewed or clicked. The search terms bid on through Google Ads are used by website owners participating in Google AdSense, allowing those owners to share in advertising revenue generated by Google.[65]

---

[63] *See Set Marketing Campaign Goals for Your Business*, GOOGLE ADS, https://ads.google.com/home/goals/ (last visited Sept. 30, 2026).
[64] *See How to Set Up Google Ads: A Checklist*, GOOGLE ADS (last updated Mar. 2023) https://business.google.com/us/resources/articles/how-to-setup-google-ads-a-checklist/.
[65] *See AdSense Revenue Share*, GOOGLE ADSENSE HELP, https://support.google.com/adsense/answer/180195?hl=en (last visited Oct. 1, 2026).

136. AdSense for content[66] and AdSense for search are methods by which AdSense functions.[67] In either configuration, AdSense matches advertisements to website users based on the content of the website and user activity.[68]

137. Google Ads intercepted Website activity during counsel's pre-suit investigation of the Website, as depicted below. This interception occurred through users' browsers as communications were sent and/or received on users' devices.



*Figure 13 – Google Ads intercepting a user's communication on the Website*

66 *See AdSense Revenue Share*, GOOGLE ADSENSE HELP, https://support.google.com/adsense/answer/180195 (last visited Oct. 1, 2026).
67 *See About Search Ads*, GOOGLE ADSENSE HELP, https://support.google.com/adsense/answer/9000515 (last visited Oct. 1, 2026).
68 *See id.*




*Figure 14 – Information captured by Google Ads intercepting a user's communication on the Website*




*Figure 15 – Cookies transmitted to and from Google on the Website*

138. Google uses the NID cookie to identify users on the Website. This allows it to match the intercepted communications with a specific user.[69]

139. While a normal user can only view the AdSense events through developer tools, advertisers and website owners such as Defendant are able to view these events in an aggregated and easily readable format. Google provides AdSense users, such as Defendant, with a dashboard where they can view the information tracked and captured by Google AdSense.[70]

140. Google benefits when website owners utilize Google Ads and Google AdSense in connection with their websites.

141. Through Google AdSense, Google aggregates viewing data collected from website users. Google uses that data to improve its services and deliver more relevant search results. By analyzing patterns and trends in user behavior, Google gains insight into what users view and what interests them. That insight supports service improvements, product development, and revenue growth.

142. Google's collection and analysis of page views also allows it to improve its machine learning algorithms.[71] Google uses data on how users interact with websites to train its algorithms and provide more accurate, relevant search results.[72] For example, when a user clicks on a particular link and spends more time on that page, Google treats that interaction as a signal of relevance to that user's interests. By aggregating such data across users, Google can develop

---

69 *See How Google Uses Cookies*, GOOGLE PRIVACY & TERMS, https://policies.google.com/technologies/cookies?hl=en-US (last visited Oct. 1, 2026).

70 *See Overview of AdSense Reports*, GOOGLE ADSENSE HELP, https://support.google.com/adsense/answer/9831227?hl=en (last visited Oct. 1, 2026).

71 *See* Elle Poole Sidell, *What Does Google Do With Your Data?*, AVAST (Dec. 18, 2020) https://www.avast.com/c-how-google-uses-your-data.

72 See *id.*

advertising profiles that include demographic and interest-based attributes, such as age range, industry, and interests.[73]

143. Google profits in several ways from the Website's use of Google AdSense: (i) advertisers bid and pay Google for the keywords that will result in their ads showing in search results; (ii) through AdSense, every time a user clicks or views an ad (depending on their chosen method), the advertiser will pay Google for that click or view; (iii) and Google's ability to aggregate user viewing data allows Google to further tailor its products to advertisers and users by training its algorithms on large volumes of data.

## X. The Reddit Pixel

144. Additionally, Defendant has installed a tracking pixel on its Website created by social media platform Reddit (the "Reddit Pixel").

145. The Reddit Pixel tracked and intercepted Plaintiffs' communications on the Website, including their searches and browsing for Defendant's products.

146. The Reddit Pixel is a piece of code that can be added to a website by a website owner to track users on the website and record the actions the users take.[74] The harvested data is subsequently used by the website owner to serve targeted ads to website users on Reddit.

147. The Reddit Pixel is also used in conjunction with Reddit's Conversion API to track specific actions that users take on the websites ("events"), such as viewing a page, submitting a search in the website's search bar, adding a product to the visitor's cart, checking out, and other specified events.[75]

---

[73] *See id.*
[74] *See About the Reddit Pixel*, REDDIT, https://business.reddithelp.com/s/article/reddit-pixel (last visited Oct. 1, 2026).
[75] *See Conversion Events*, REDDIT, https://business.reddithelp.com/articles/Knowledge/supported-conversion-events (last visited Oct. 1, 2026).

148. Reddit makes use of a website owner's pixel ID to determine which data should be tracked when sending the code for the Pixel to the user's browser,[76] and to specify "which business account should receive" the user's tracking data.[77]

149. Reddit admits that it shares users' Sensitive Information with third parties, just as Plaintiffs' Sensitive Information was shared here.[78]

150. In Defendant's use of the Reddit Pixel, Defendant configured the Reddit Pixel to include a parameter called "id" which identifies Defendant's Reddit Pixel ID as "a2_gngoob4t2ogt". This data is sent both when receiving communications from the Website and as users send communications to the Website.

151. Website owners, like Defendant, can enable a feature of the Reddit Pixel known as "Auto-Advanced Matching" to determine the exact identity of Reddit users who visit the website.[79]

152. Auto-Advanced Matching automatically scrapes a website for any email addresses typed or inserted by a visitor and sends that email information to Reddit.[80]

153. In addition to email addresses, a website owner can enable the Reddit Pixel and the Conversion API to send additional personal information to Reddit, known as "match keys," to identify website users.[81]

[76] *See Install the Reddit Pixel Directly*, REDDIT, https://business.reddithelp.com/s/article/Install-the-Reddit-Pixel-on-your-website (last visited Oct. 1, 2026).
[77] *See About the Reddit Pixel*, *supra* note 74.
[78] *See Reddit Privacy Policy*, REDDIT (last updated May 26, 2026) https://www.reddit.com/policies/privacy-policy.
[79] *See Auto-Advanced Matching*, REDDIT, https://business.reddithelp.com/s/article/automated-advanced-matching (last visited Oct. 1, 2026).
[80] *See id.*
[81] *See About Match Keys*, REDDIT, https://business.reddithelp.com/s/article/about-match-keys#customer-match-keys-and-identifiers (last visited Oct. 1, 2026).

154. IP addresses are match keys website owners are required to send to Reddit, while other match keys may be used, including:

- Mobile Advertising IDs (a unique identifier for a mobile user);
- Reddit Click IDs (to attribute click conversions more accurately);
- External IDs (an advertiser-assigned identifier that enhances match accuracy);
- Reddit UUIDs (a unique ID generated by the Reddit Pixel);
- Cookies, such as the logged-out ID or "loid" cookie;
- User Agents (which identify the software the user is using to access the website); and
- The visitor's screen dimensions.[82]

155. The Reddit "loid" cookie allows Reddit to track Reddit users who are not logged in. This cookie is placed on users' devices, is accessed by the Reddit Pixel, and is combined with other Sensitive Information before being transmitted to Reddit. This cookie, and the other match keys, can be used by Reddit to match an otherwise anonymous website visitor to their Reddit account, or even to identify them outright, associating their identity with their activity on the website.

156. Reddit uses this data to help advertisers, including Defendant, gauge the effectiveness of their ad campaigns, improve their ability to attribute activity to specific ad campaigns, track users across devices, and help them create more precisely targeted ad campaigns.[83]

---

[82] *See id.*
[83] *Id.*

157. Additionally, Reddit employs this data to optimize its own ad placements and to develop new services.[84]

158. Defendant's use of the Reddit Pixel on the Website is demonstrated by the screenshots below, taken during counsel's pre-suit investigation of the Website, which follow a user's journey to searching for and purchasing a product on the Website.




*Figure 16 – Reddit intercepting a user's communication on the Website*

[84] *See Reddit Privacy Policy*, *supra* note 78.




*Figure 17 – Information captured by Reddit intercepting a user's communication on the Website*




*Figure 18 – Cookies transmitted to and from Reddit on the Website*




*Figure 19 – Reddit tracking a user adding a product to their cart through the "AddToCart" event on the Website*




*Figure 20 – Information captured by Reddit when it tracks a user adding an item to their cart through the "AddToCart" event on the Website*

159. To utilize the Reddit Pixel, Defendant agreed to Reddit's Business Tool Terms (the "Reddit Terms").

160. The Reddit Terms inform website owners, such as Defendant, that the employment of the Reddit Pixel will result in data sharing, including with Reddit, of users' website actions, email addresses, cookie IDs, and device IDs, among other "matching parameters."[85]

161. The Reddit Terms make clear that the onus is on Defendant to provide all necessary transparency notices, and obtain all necessary rights, permissions, and lawful bases, including consent, to share information with Reddit.

---

[85] *Reddit Business Tool Terms*, REDDIT (last updated Aug. 7, 2025) https://business.reddithelp.com/s/article/Reddit-Business-Tool-Terms.

162. The Reddit Terms explicitly conditions the use of tools like the Reddit Pixel on website owners' warranties that they: (i) "prominently disclose … and obtain any legally required consent from users" regarding their use of the Reddit Pixel's data sharing; (ii) provide end users "clear, prominent, and legally sufficient instructions regarding how to opt out of such data collection and use[;]" and (iii) do not share "any data related to users who have not provided consent."[86]

163. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Reddit Pixel, and ignored Reddit's warnings to safely handle its users' data and to warn its users that the Website would disclose information in a manner that threatened users' Sensitive Information.

## XI. The Snap Pixel

164. Defendant also installed code on the Website created by Snapchat that tracks Website users' actions, behavior, and conversions across the Website (the "Snap Pixel").

165. To make use of the Snap Pixel, Defendant must create a Snapchat Ads Manager account, create a pixel, receive a Pixel ID, select the information to be collected, follow specific guides for integration with third-party software like Shopify or Google Tag Manager, and determine whether to enable automated matching for the Snap Pixel.[87]

---

[86] *Id.*

[87] *See Getting Started with Enabling the Pixel*, SNAPCHAT BUSINESS HELP CENTER, https://businesshelp.snapchat.com/s/article/pixel-website-install?language=en_US&r=692&ui-knowledge-components-aura-actions.KnowledgeArticleVersionCreateDraftFromOnlineAction.createDraftFromOnlineArticle=1 (last visited Oct. 1, 2026); *see also Directly Implement the Pixel On Your Website*, SNAPCHAT BUSINESS HELP CENTER, https://businesshelp.snapchat.com/s/article/pixel-direct-implementation?language=en_US (last visited Oct. 1 2026).

166. The Snap Pixel is a piece of JavaScript code provided by Snapchat that allows advertisers, such as Defendant, to track user actions and behavior on websites for the purpose of measuring ad performance, optimizing ad campaigns, and building targeted audiences for better advertising results.[88]

167. "For the Pixel to work, [Snapchat] need[s] to receive a Pixel ID and a standard event type[,]" at a minimum.[89]

168. The Pixel ID is an "[a]dvertiser specific ID"[90] where the Pixel ID is used to initialize the Snap Pixel's tracking,[91] identifying which advertising account receives the collected data.

169. This software may be automatically or manually added to a website's webpages, but in either case, the software must be added to each webpage being tracked.[92]

---

[88] *See Using the Snap Pixel*, SNAPCHAT FOR BUSINESS (July 11, 2023) https://forbusiness.snapchat.com/blog/the-snap-pixel-how-it-works-and-how-to-install-it; *see also Snapchat Pixels*, SPRINKLR, https://www.sprinklr.com/help/articles/snapchat-pixel/snapchat-pixels/640739d87517d84a3aaf2d26 (last visited Oct. 1, 2026); Marialuisa Aldeghi, *How to Set Up the Snap Pixel: A Step-by-step Guide*, LEADSBRIDGE (Dec. 18, 2024) https://leadsbridge.com/blog/snap-pixel/.

[89] *Pixel Implementation FAQs*, SNAPCHAT BUSINESS HELP CENTER, https://businesshelp.snapchat.com/s/article/snap-pixel-faq?language=en_US (last visited Oct. 1, 2026).

[90] *See Snap Pixel Helper Glossary*, SNAPCHAT BUSINESS HELP CENTER, https://businesshelp.snapchat.com/s/article/pixel-helper-glossary?language=en_US (last visited Oct. 1, 2026).

[91] *See About Snap Pixel*, SNAPCHAT BUSINESS HELP CENTER, https://businesshelp.snapchat.com/s/article/snap-pixel-about?language=en_US (last visited Oct. 1, 2026).

[92] *See Directly Implement the Pixel On Your Website*, SNAPCHAT BUSINESS HELP CENTER, https://businesshelp.snapchat.com/s/article/pixel-direct-implementation?language=en_US (last visited Oct. 1, 2026).

170. Key features of the Snap Pixel include tracking user actions ("events") designated by advertisers, such as page views, add-to-cart actions, purchases, and sign-ups.[93] Advertisers, such as Defendant, can add additional parameters to these events for more granular insights, like currency or price information.[94] The information is collected immediately as users land on the website where the pixel is installed.[95]

171. The Snap Pixel also allows cross-device tracking, enabling tracking across multiple devices to provide a comprehensive view of a customer's journey.[96]

172. The Snap Pixel collects:

a. The time the website actions occurred;[97]

b. Device information such as the hardware model, operating system, and browser type used;[98]

c. Cookies;[99]

d. Metadata such as button clicks,[100] conversions, and page visits;[101] and

---

93 *See Pixel Event Examples*, SNAPCHAT BUSINESS HELP CENTER, https://businesshelp.snapchat.com/s/topic/0TO8b000000P8xxGAC/pixel-event-examples?language=en_US (last visited Oct. 1, 2026).

94 *See Additional Parameters Example*, SNAPCHAT BUSINESS HELP CENTER, https://businesshelp.snapchat.com/s/article/additional-parameters?language=en_US (last visited Dec. 22, 2025).

95 *See Using the Snap Pixel*, *supra* note 88; *see also* Aldeghi, *supra* note 88.

96 *See About Snap Pixel*, *supra* note 91.

97 *See Snap Pixel: Power Your Ad Performance*, SNAPCHAT FOR BUSINESS, https://forbusiness.snapchat.com/advertising/snap-pixel (last visited Oct. 1, 2026).

98 *See Privacy Policy*, SNAP INC. (last updated Sept. 21, 2026) https://values.snap.com/privacy/privacy-policy.

99 *See Cookie information*, SNAP INC. (last updated Aug. 14, 2026) https://www.snap.com/privacy/cookie-information.

100 *See Set Up Snap Pixel*, TAGGRS, https://taggrs.io/docs/server-side-tracking/snapchat/snap-pixel (last visited Oct. 1, 2026).

101 *See Directly Implement the Pixel On Your Website*, SNAPCHAT BUSINESS HELP CENTER, https://businesshelp.snapchat.com/s/article/pixel-direct-implementation?language=en_US (last visited Oct. 1, 2026).

e. IP addresses for general geographic data.[102]

173. The Snap Pixel enables website owners, such as Defendant, to understand how users navigate to their site. This data helps Defendant refine their advertising strategies by identifying high-performing campaigns and optimizing ad spending.[103]

174. The Website's Snap initialization code and Pixel event activations transmit Defendant's Pixel ID in the form of a URL parameter named "pid," which contains Defendant's Snap Pixel ID value of "f2c394c9-ce74-4fb6-a9aa-aab0657a00e2." This data is sent both when receiving communications from the Website and as users send communications to the Website.

175. The information the Snap Pixel collects provides Defendant with a better understanding of who its customers are, and how they navigate around the Website.

176. Snapchat also independently benefits from non-customer list audience information.

177. The harvested data collected by the Snap Pixel is used by Defendant to create custom audiences. Defendant can retarget users who viewed specific pages or made purchases and build lookalike audiences to reach new users with similar characteristics.[104]

178. Put simply, the Snap Pixel collects as much data as it can about otherwise anonymous visitors to the Website and matches it with existing data Snapchat has acquired and accumulated about millions of Americans to improve Defendant's conversion rates and reduce overall advertising costs.

179. Snap Pixel requires advertisers, such as Defendant, to integrate code into their website's header or use tools like Google Tag Manager for a seamless setup. Advertisers, such as

---

[102] *See id.*
[103] *See* Aldeghi, *supra* note 88.
[104] *See id.*

Defendant, are encouraged to use tools like Snap Pixel Helper to verify proper installation, ensure accurate event tracking, and track user activity.[105]

180. Defendant, through the Snap Pixel, uses data and cookies to track users and serve them relevant ads on Snapchat based on how they interacted with the Website. The data received from Snapchat conversion tracking allows Defendant to serve highly targeted ad campaigns to the right people.[106]

181. Using the Snap Pixel helps Defendant collect important information about the people who buy from it so that Defendant, in turn, can benefit. Here are some of the biggest benefits:

- Measure conversion events that matter: See all the actions users take on the Website, across all devices, and attribute conversions back to ad campaigns.
- Reach the perfect audience: Create custom audiences and lookalike audiences based on the specific actions users have taken on the Website.
- Optimize advertising campaigns: Use real-time insights to optimize delivery of Defendant's campaigns for more effective results.[107]

182. During counsel's pre-suit investigation of the Website, counsel identified the invasive Snap Pixel code secretly embedded on Defendant's Website, as pictured below:

---

[105] *Id.*
[106] *Id.*
[107] *See Using the Snap Pixel*, *supra* note 88.




*Figure 21 – Snapchat intercepting a user's communication on the Website*




*Figure 22 – Information captured when Snapchat intercepts a user's communication on the Website*




*Figure 23 – Cookies transmitted to and from Snapchat on the Website*

183. When the Snap Pixel triggers, it captures the relevant data and sends a transmission to Snapchat's servers as depicted in the pictures above, which show Defendant's Snap Pixel instantly sending communications to Snapchat as users take certain actions on the Website, like viewing a page.

184. By using the Snap Pixel and providing Snapchat with users' information, Defendant had to agree to Snapchat's Personal Data Terms (the "Snap Terms"), among other agreements governing the use of the Snap Pixel.

185. By agreeing to the Snap Terms, Defendant represented and warranted that the personal data it shares with Snapchat will not contain any information about individuals under the age of 13 or any sensitive information or special category data.[108]

186. The Snap Terms further remind Snap Pixel users, such as Defendant, of their responsibility to secure and maintain "all necessary rights, licenses and consents required to provide or make available the personal data" shared through the Snap Pixel.[109]

187. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from the use of the Snap Pixel, and ignored Snapchat's warnings to safely handle its users' data and to warn its users that the Website would disclose their information in a manner that threatens their Sensitive Information.

## XII. The Tracking Tools Intercepted and Disclosed Both the Contents of Plaintiffs' Communications With the Website, As Well as the Routing, Addressing, and Identifying Information Associated With Those Communications

188. Each time Plaintiffs visited the Website, the Tracking Tools contemporaneously intercepted the full address of the page requested and the cookies sent with that request, which is reflected and can be seen in the transmitted URLs.

[108] *See Personal Data Terms*, SNAP INC. (last updated June 30, 2025) https://www.snap.com/terms/personal-data#:~:text=In%20summary%3A%20you%20provide%20a,information%3B%20you%20obtained%20any%20necessary.

[109] *Id.*

189. Here, the network requests intercepted by the Tracking Entities included detailed Request URLs created by Defendant containing the names and file locations of webpages, the detailed URLs and content users requested and accessed on the Website, identifying information in the form of cookies, and users' activity information reflecting their interactions with the Website.

190. The Tracking Tools intercepted the contents of Plaintiffs' communications contemporaneously with Plaintiffs' interactions with the Website. The Tracking Tools began transmitting data to the Tracking Entities as soon as the Tracking Tools loaded onto Plaintiffs' browsers, and additionally transmitted data at the moment Plaintiffs communicated with the Website.

191. The Tracking Tools also intercepted and disclosed Plaintiffs' IP addresses, Defendant's personal identifiers for each Tracking Tool, and the cookies that individually identified Plaintiffs.

192. The Tracking Entities' interception, duplication, and retransmission of portions of communications between Plaintiffs and the Website occurred inside Plaintiffs' browsers, before the communications fully reached users' devices, or before they were transmitted from users' devices, and therefore occurred while the communications were in transit. As only targeted portions of the communications were captured and duplicated, this interception must have occurred simultaneously with the reading and analysis of the communications themselves.

193. Defendant's deployment of the Tracking Tools on the Website enabled Tracking Entities to intercept Request URLs that specified the content Plaintiffs accessed on the Website, in violation of CIPA at Cal. Penal Code § 631 and the federal Wiretap Act at 18 U.S.C. § 2511(1)(a).

## XIII. Plaintiffs Did Not Consent to Third-Party Tracking

194. When Plaintiffs visited Defendant's Website, they were presented with a Cookie Banner and Privacy Settings that stated that users could decline all non-essential cookies, including those from the Tracking Entities.

195. The Privacy Settings provided toggles and controls that allowed Plaintiffs to decline non-essential cookies and the sale or sharing of their personal information.

196. Plaintiffs rejected non-essential cookies and rejected the sale or sharing of their personal information, reasonably believing that non-essential tracking would stop. The Privacy Settings communicated to Plaintiffs that they could prevent their browsing activity from being shared with Tracking Entities, including through the use of cookies.

197. These representations were false.

198. *First*, the Website's default settings permitted tracking to begin as soon as users arrived on the Website, before users could click "Manage Preferences" on the Cookie Banner.

199. As a result, users were tracked from the moment they began using the Website, without prior consent.

200. Plaintiffs visited the Website while those default tracking settings were active.

201. *Second*, even when users declined all non-essential cookies through the Cookie Banner and Privacy Settings, Defendant placed, and allowed to be placed, the third-party cookie from Reddit, which continued to be transmitted to Reddit after those cookies were declined.

202. Representations regarding cookie-consent controls are materially misleading where tracking continues despite a website's claim to the contrary and/or users' selections.

203. As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class members suffered actual damages, including the loss of control over their personal information

and the diminution in value of that information.[110] Plaintiffs' and the Class members' Sensitive Information has concrete economic value, as shown by the robust market in which such data is bought, sold, and licensed.[111] Through its Cookie Banner and Privacy Settings, Defendant represented that users could decline non-essential tracking, thereby preserving the security and value of their Sensitive Information. Plaintiffs relied on that representation and affirmatively declined. By facilitating the Tracking Entities' interception, collection, and transmittal of Plaintiffs' Sensitive Information to the Tracking Entities regardless of Plaintiffs' affirmative rejection of all but strictly necessary cookies, Defendant took for itself and its partners the value of that information without consent or compensation. Defendant also stripped Plaintiffs of the ability to decide whether, when, to whom, and on what terms their Sensitive Information would be shared and/or sold.

204. Plaintiffs value the privacy and exclusivity of their Sensitive Information. It is plausible, and indeed likely, that Plaintiffs would at some point have monetized their data by selling or licensing it through one of the many available channels.[112] Defendant's unauthorized

---

[110] *See Brown v. Google LLC*, No. 20-CV-03664-LHK, 2021 WL 6064009, at *14 (N.D. Cal. Dec. 22, 2021) (finding that "[p]laintiffs 'have suffered harm in the form of diminution of the value of their private and personally identifiable data and content'" through defendant's collection of plaintiffs' data); *see also Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 636 (N.D. Cal. 2021) (concluding that "that plaintiffs who suffered a loss of their personal information suffered economic injury" and had standing sufficient to satisfy statutory requirements of economic injury).

[111] *See* Order Denying Google's Mot. for Summ. J. at 33, *Brown v. Google LLC*, No. 4:20-cv-03664-YGR, 2023 U.S. Dist. LEXIS 139895 (N.D. Cal. Aug. 7, 2023) (finding a Google pilot program paying users for access to their browsing history sufficient to establish the existence of a market for users' personal data); *see also* Madison Mills, *Exclusive: Verb lets you sell your data to AI labs for training*, AXIOS (Aug. 6, 2026), https://www.axios.com/2026/08/06/exclusive-verb-lets-you-sell-your-data-to-ai-labs-for-training (describing operations for data exchange marketplace startups Verb, Mercor, and Vana, which enable users to sell personal data as training data); Megan Morrone, *Exclusive: New wallet app lets users store their own training data*, AXIOS (Sept. 22, 2025) https://www.axios.com/2025/09/22/ai-training-data-vana-app-mit (similar).

[112] *See* Mills, *supra* note 111; *see also* Morrone, *supra* note 111.

dissemination has foreclosed or diminished that opportunity, because data that has already been captured and distributed to third parties without restriction commands a lower price, or no price at all, in that market. Plaintiffs therefore lost the benefit of their bargain, lost the exclusive value of their Sensitive Information, and did not receive the privacy protections Defendant promised.

205. A well-developed market exists in which consumers are compensated for access to their browsing and online activity data.[113] Because Defendant and its third-party partners have already obtained Plaintiffs' information without authorization, any prospective purchaser of that information would pay less for it, or would not pay for it at all, since the information is no longer exclusive to Plaintiffs.

## <u>TOLLING</u>

206. The statutes of limitations applicable to Plaintiffs' and the Class members' claims are tolled by Defendant's wrongful conduct and by Plaintiffs' and the Class members' delayed discovery of their claims. Defendant's acts were technically complex and inherently self-concealing, thereby preventing Plaintiffs and the Class members from discovering the unlawful disclosure of their Sensitive Information until recently.

207. Defendant not only facilitated and enabled the covert incorporation of Tracking Entities' Tracking Tools into its Website, but also, via its Privacy Settings, misrepresented its data sharing practices.

208. Defendant possessed superior and exclusive knowledge that the Tracking Entities' Tracking Tools embedded within its Website would disclose Plaintiffs' and Class members' Sensitive Information in contradiction to Plaintiffs' cookie settings preferences.

[113] *See* Mills, *supra* note 111; *see also* Morrone, *supra* note 111.

209. Plaintiffs and the Class members could not, through the exercise of reasonable diligence, have discovered the full scope of Defendant's conduct and misrepresentations because the technology involved is highly technical and not reasonably discernible to ordinary users.

210. Plaintiffs and the Class members first became aware of Defendant's misconduct as a result of counsel's investigation and technical analysis conducted in advance of filing this Complaint, on or about February 6, 2026.

## DEFENDANT'S POSITION REGARDING ARBITRATION

211. Defendant contends that no valid agreement to arbitrate exists between the parties. Plaintiffs, however, previously commenced arbitrations against Defendant. The parties thereafter stipulated to the dismissal of Plaintiffs' arbitrations based on Defendant's position that no valid arbitration agreement existed between the parties. Defendant therefore cannot now rely on that purported arbitration agreement as a basis to compel arbitration or otherwise preclude Plaintiffs from pursuing these claims in this Court.

## CLASS ALLEGATIONS

212. Plaintiffs bring these claims for relief pursuant to the Federal Rules of Civil Procedure 23(a) and 23(b) on behalf of the following Class and Subclasses:

213. Plaintiffs bring this class action individually and on behalf of the following Class:

> All persons in the United States who visited the Website before March 31, 2026 and opted out of some or all of the cookie categories on the Privacy Settings page (the "Class").

214. Plaintiffs Gaffney and Woloz (the "California Plaintiffs") bring this class action individually and on behalf of the following California Subclass:

> All members of the Class who visited the Website while located in the State of California (the "California Subclass").

215. Plaintiff Forero brings this class action individually and on behalf of the following New York Subclass:

> All members of the Class who visited the Website while located in the State of New York (the "New York Subclass").

216. Specifically excluded from the Class are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, servants, partners, joint venturers, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

217. Plaintiffs reserve the right to amend the Class and Subclass definitions above if further investigation and/or discovery reveal that the Class should be expanded, narrowed, further divided into subclasses, or otherwise modified in any way.

218. NUMEROSITY: At this time, Plaintiffs do not know the number of Class members but believe the number to be at least measured in thousands, if not millions, given the popularity of Defendant's Website. The number of persons within the Class is believed to be so numerous that joinder of all members is impracticable. The exact identities of Class members may be ascertained via the records maintained by Defendant in the ordinary course of its business.

219. COMMONALITY: Common questions of fact and law exist as to all Class members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between the Class members, and which may be determined without reference to the individual circumstances of any Class member, include but are not limited to the following:

- Whether Defendant shared the Class members' Sensitive Information with the Tracking Entities or other third parties and/or facilitated the Tracking Entities' interception of the Class members' Sensitive Information;
- Whether Defendant obtained effective and informed consent to do so;
- Whether Defendant's conduct constitutes a violation of the Wiretap Act;
- Whether the Class members are entitled to actual damages, punitive damages, and/or statutory penalties

220. TYPICALITY: As persons who visited Defendant's Website and whose personal information was shared by Defendant, Plaintiffs are asserting claims that are typical of the Class members.

221. ADEQUACY: Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class members or whose inclusion would otherwise be improper are excluded.

222. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class members is impracticable and inefficient. It would be unduly burdensome on the courts, where individual litigation of numerous cases would proceed. If Class treatment of these claims is not available, Defendant will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

## CAUSES OF ACTION

### COUNT I
### COMMON LAW INVASION OF PRIVACY
### Intrusion Upon Seclusion
### (On Behalf of California Plaintiffs and the California Class)

223. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

224. Defendant has intruded upon the legally protected privacy interests of the California Plaintiffs and the Class members by, among other things, permitting Tracking Tools to intercept and make use of users' Sensitive Information by compiling it with other user information gathered across the internet, while representing to users that they could decline such collection.

225. The California Plaintiffs and the Class members maintained a reasonable expectation that their communications with Defendant via the Website would remain private, specifically with respect to their personal information, including browsing activity, device identifiers, and related metadata, which has been recognized as sensitive information. Plaintiffs expected that their interactions with the Website would not be shared with third-party analytics providers.[114]

226. The California Plaintiffs and Class members relied on Defendant's representations and exercised the Website's controls, reasonably expecting that Defendant would honor its affirmative representation in the Cookie Banner and Privacy Settings that users could decline unnecessary cookies.

---

[114] For example, California enacted the California Consumer Privacy Act of 2018 ("CCPA") and amended it in 2020 through Proposition 24, the California Privacy Rights Act (CPRA). The CPRA sets out that collecting and using "personal information," including real names, online identifiers, internet browsing and search history, location data, audio and visual information, etc., requires businesses to provide adequate notice of such practices. *See generally,* Cal. Civ. Code §§ 1798.100, 1798.105, 1798.106, 1798.110, 1798.115, 1798.120, 1798.140(v).

227. Despite California Plaintiffs' and the Class members' selections, Defendant permitted Tracking Entities to use cookies and related Tracking Tools to collect and compile users' Sensitive Information, including the categories described above. The Tracking Entities used and profited from these data to create detailed user profiles, audience segments, and targeted advertising, and to share and monetize those profiles.

228. Defendant lacked any legitimate business justification for permitting the placement and transmission of third-party cookies and Tracking Tools that allowed Tracking Entities to access, intercept, and collect users' Sensitive Information, contrary to users' express selections.

229. As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class members suffered injury, including but not limited to loss of privacy, loss of control over their personal information, diminution in value of their private data, and other compensable harms.

230. Plaintiffs and the Class members seek all available relief for this claim, including compensatory damages, restitution, disgorgement of profits, statutory and punitive damages where available, and injunctive relief to prevent further unlawful tracking.

**COUNT II**
**INVASION OF PRIVACY AND**
**VIOLATIONS OF THE CALIFORNIA CONSTITUTION, Art. 1, § 1**
**(On Behalf of the California Plaintiffs and the California Subclass)**

231. The California Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

232. The California Plaintiffs bring this cause of action on behalf of themselves and all California Subclass members.

233. Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending

life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." California Constitution, Article I, Section 1.

234. California voters added the words "and privacy" to the California Constitution when they passed Proposition 11 in 1972. Proposition 11 is also known as the "Privacy Initiative" or "Right to Privacy Initiative." In support of Proposition 11, Assemblyman Kenneth Cory and State Senator George Moscone stated, "[t]he right of privacy is the right to be left alone…. It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us. Fundamental to our privacy is the ability to control the circulation of personal information. This is essential to social relationships and personal freedom."[115]

235. The California Plaintiffs and the California Subclass members have a legally protected interest in their Sensitive Information, such as browsing activity, device identifiers, and related metadata, which Defendant violated by providing the Tracking Entities access to that data, enabling the interception of such communications.

236. The California Plaintiffs and the California Subclass members' protected interests arise from various statutes and common law, including, inter alia, the Wiretap Act, CIPA, and the California Constitution, which protects privacy rights and includes the "ability to control circulation of our personal information."

237. The privacy rights of the California Plaintiffs and the California Subclass members were invaded through the interception and collection of their data, which included their Sensitive

[115] Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972), argument in favor of Prop. 11.

Information, without first obtaining authorization or consent from the California Plaintiffs and the California Subclass members.

238. The California Plaintiffs and the California Subclass members had a reasonable expectation of privacy when communicating with Defendant's Website and thereby providing and/or transmitting their Sensitive Information. By causing third-party cookies and Tracking Entities to be placed on users' browsers and devices and by transmitting users' Sensitive Information to Tracking Entities despite users' selections, Defendant violated their reasonable expectation of privacy.

239. Defendant's intrusion, placing third-party Tracking Tools and enabling third-party access to users' Sensitive Information despite users' express rejection of such tracking, is and would be highly offensive to a reasonable person.

240. As a direct and proximate result of Defendant's intentional invasion of their privacy rights, the California Plaintiffs and the California Subclass members have been harmed and are entitled to compensatory, punitive, and injunctive relief.

**COUNT III**
**VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT**
**Cal. Penal Code § 631**
**(On Behalf of the California Plaintiffs and the California Subclass)**

241. The California Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

242. The California Plaintiffs bring this cause of action on behalf of themselves and all California Subclass members.

243. CIPA was enacted to curb "the invasion of privacy resulting from the continual and increasing use of" certain technologies determined to pose "a serious threat to the free exercise of

personal liberties." Cal. Penal Code § 630. CIPA extends civil liability for various means of surveillance using technology.

244. CIPA provides that a person is liable to another where, "by means of any machine, instrument, or contrivance, or in any other manner," they committed any of the following: (i) "intentionally tap[ped], or mad[e] any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system[;] or [(ii)] … willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [(iii)] … uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained[;] or [(iv)] aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section." Cal. Penal Code § 631(a).

245. The Website, the Tracking Tools, and the California Plaintiffs' devices and browsers each qualify as a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here. Cal. Penal Code § 631(a).

246. Within the relevant time period, the Tracking Entities, including Google, through the use of the Tracking Tools, without the consent of all parties to the communication, or in any unauthorized manner, willfully read or attempted to read or learn the contents or meaning of electronic communications of the California Plaintiffs and the California Subclass members,

contemporaneous with the communications transiting through or passing over any wire, line or cable or with the communications sent from or being received at any place within California.

247. The information collected by the Tracking Tools was not for the sole benefit of Defendant. Within the relevant time period, Defendant aided, agreed with, and employed the Tracking Entities to accomplish the wrongful conduct at issue here.

248. The California Plaintiffs and the California Subclass members did not authorize or consent to the tracking, interception, and collection of any of their electronic communications. Defendant's violations of Cal. Penal Code § 631 constitute invasions of privacy of the California Plaintiffs and the California Subclass members.

249. As a direct and proximate result of Defendant's violations of Cal. Penal Code § 631, the California Plaintiffs and the California Subclass members have been damaged and are entitled to relief under Cal. Penal Code § 637.2, including:

a. damages in an amount to be determined at trial, assessed as three times the amount of actual damages sustained, or statutory damages of $5,000 per violation, whichever is greater; and

b. appropriate equitable and declaratory relief.

**COUNT IV**
**VIOLATIONS OF THE WIRETAP ACT**
**18 U.S.C. § 2510, et seq.**
**(On Behalf of Plaintiffs and the Class)**

250. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

251. Plaintiffs bring this cause of action on behalf of themselves and all Class members.

252. The federal Wiretap Act prohibits the intentional interception of any wire, oral, or electronic communication without the consent of at least one authorized party to the communication. *See* 18 U.S.C. § 2511.

253. The Wiretap Act provides a private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

254. The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

255. The Wiretap Act defines "contents" as "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

256. The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

257. The Wiretap Act defines "person" to include, *inter alia*, any individual, partnership, association, trust, or corporation. 18 U.S.C. § 2510(6).

258. Plaintiffs, Defendant, and the Tracking Entities are "persons" within the meaning of the Wiretap Act.

259. The Tracking Tools, Plaintiffs' devices and browsers, and Defendant's website server constitute "device[s]" or "apparatus[es]" capable of intercepting wire, oral, or electronic communications within the meaning of 18 U.S.C. § 2510(5).

260. Plaintiffs had a reasonable expectation of privacy in their electronic communications with Defendant's Website, including the pages they viewed, browsing activity, and other interactions with Website features, particularly where Defendant represented through its Cookie Banner and Privacy Settings that users could reject all tracking and all non-required cookies.

261. Within the relevant time period, Plaintiffs' electronic communications with the Website were intercepted contemporaneously at the moment they were collected by the Tracking Tools and transmitted to Tracking Entities without Plaintiffs' consent from Plaintiffs' browser, for the unlawful purpose of monetizing Plaintiffs' intercepted information, including for combining that information with information collected about Plaintiffs from across the Internet via the same Tracking Tools and used for advertising, analytics, and marketing optimization.

262. Interception occurred whenever Plaintiffs interacted with the Website, including when they navigated webpages, viewed content, or otherwise communicated information to the Website through their browsers.

263. At all relevant times, Defendant's conduct was knowing, willful, and intentional. Defendant is a sophisticated commercial entity that knowingly embedded and enabled the Tracking Tools on its Website and understood that doing so would result in the interception and transmission of users' communications to the Tracking Entities.

264. Plaintiffs did not consent to the interception, recording, disclosure, or use of their electronic communications with the Website by the Tracking Entities. To the contrary, Plaintiffs affirmatively declined Tracking Entities' tracking through Defendant's Cookie Banner.

265. The unauthorized interception and use of Plaintiffs' electronic communications by the Tracking Entities were only possible because Defendant knowingly and intentionally placed and enabled the Tracking Tools on the Website. *See* 18 U.S.C. § 2511(1)(a).

266. Defendant intentionally used the contents of Plaintiff's communications to further its own marketing and analytics efforts. *See* 18 U.S.C. § 2511(1)(d).

267. As a direct and proximate result of Defendant's violations of the Wiretap Act, Plaintiffs have been damaged and are entitled to relief under 18 U.S.C. § 2520, including:

c. damages in an amount to be determined at trial, assessed as the greater of actual damages suffered by Plaintiffs and any profits made by the intercepting parties as a result of the violations, or

d. statutory damages of the greater of $100 per day per violation or $10,000; appropriate equitable and declaratory relief; and

e. reasonable attorneys' fees and costs.

**COUNT V**
**VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code § 17200, et seq.**
**(On Behalf of the California Plaintiffs and the California Subclass)**

268. The California Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

269. The California Plaintiffs bring this cause of action on behalf of themselves and all California Subclass members.

270. The UCL broadly prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

271. By actively and affirmatively misleading consumers by omitting to inform them of the Tracking Tools on the Website, Defendant has violated the fraudulent prong of the UCL.

272. Defendant has violated the unlawful prong of the UCL by way of Defendant's above-described violations of the Wiretap Act and CIPA arising from Defendant's purposeful installation and utilization of the Tracking Tools on the Website.

273. By actively and fraudulently deceiving users about their ability to disable the Tracking Tools, Defendant has violated the fraudulent prong of the UCL.

274. Defendant failed to disclose the presence of the Tracking Tools on the Website. Defendant disclosed the California Plaintiffs' and the California Subclass members' Sensitive Information without their knowledge or consent. Defendant disclosed Plaintiffs' and the California Subclass members' information to the Tracking Entities to build personal profiles without their knowledge or consent. Defendant failed to disclose that it was wiretapping users' communications with the Website. Defendant fraudulently deceived users about their ability to disable the Tracking Tools. Through this conduct, Defendant violated the unfair prong of the UCL.

275. The California Plaintiffs have standing to bring claims against Defendant under the UCL. The California Plaintiffs' information was tracked and recorded without consent. The California Plaintiffs' data was used to build personal profiles for advertising purposes without consent. As a result, the California Plaintiffs lost control over their personal data and that data was diminished in value.

276. The California Plaintiffs would have considered it important to the decision to visit Defendant's Website to know that their data was being tracked and recorded without their consent, and regardless of privacy elections made through the Cookie Banner and Privacy Settings.

277. Instead, the California Plaintiffs exercised the Website's privacy controls and continued using the Website in reliance on Defendant's representations that non-essential tracking had been disabled and that their information would not be shared with Tracking Entities.

278. Because of Defendant's UCL violations described above, Plaintiffs suffered injury by losing control of their personal data and having their Sensitive Information tracked and recorded without their consent.

279. The California Plaintiffs and California Subclass members seek all available relief for Defendant's use of unfair acts or practices, including injunctive relief.

**COUNT VI**
**COMMON LAW FRAUD, DECEIT, AND/OR MISREPRESENTATION**
**(On Behalf of Plaintiffs and the Class)**

280. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

281. Plaintiffs bring this cause of action on behalf of themselves and all Class members.

282. Defendant made affirmative representations to users through its Cookie Banner, Privacy Settings, and related disclosures that users could decline all non-necessary cookies.

283. Defendant represented that exercising those options would limit or prevent the deployment of Tracking Tools, including analytics and marketing cookies, and would stop the transmission of users' browsing activity, interactions, and related data to the Tracking Entities.

284. Defendant made these representations at the time users first accessed the Website and again when users were prompted to review and confirm their cookie preferences.

285. These representations were false and misleading. Before users, including Plaintiffs and the Class members, were able to decline all unnecessary cookies, Defendant deployed the Tracking Tools to intercept and collect Plaintiffs' and the Class members' Sensitive Information and transmit the same to the Tracking Entities.

286. Defendant knew the representations were false or misleading, or acted with reckless disregard for their truth, because Defendant controlled the Website's source code, selected and configured the Tracking Tools, and determined how those tools operated in relation to users'

expressed privacy choices. Defendant also received reports on the Tracking Tools functionality, which would have alerted Defendant to decreased information intake if its "opt-in" Tracking Tool scheme was functioning as described.

287. Defendant had the technical ability to prevent data transmissions and to configure the Website so that non-essential tracking ceased when users declined such tracking. Industry-standard tools, configurations, and consent-management frameworks exist that permit websites to block, defer, or condition the loading of non-essential Tracking Tools based on users' preferences, and Defendant could have implemented such measures.

288. Defendant made misrepresentations with the intent to induce reliance by users, including Plaintiffs, by reassuring them that they could meaningfully control tracking while Defendant continued to collect and transmit data for its own commercial benefit.

289. Plaintiffs and the Class members reasonably and justifiably relied on Defendant's misrepresentations by continuing to use the Website and by exercising the decline controls instead of avoiding the Website, withholding information, or taking additional steps to protect their privacy.

290. Plaintiffs' and the Class members' reliance was reasonable because Defendant presented the Cookie Banner and Privacy Settings as mechanisms for exercising legally protected privacy rights and for controlling the collection and sharing of personal information.

291. As a direct and proximate result of Defendant's fraudulent conduct, Plaintiffs and the Class members suffered damages, including loss of privacy, loss of control over their personal information, and diminution in the value of their personal data. Plaintiffs and the Class members suffered injury, including unauthorized disclosure of their communications, loss of control over

their personal information, and loss of the privacy protection Defendant represented it would provide.

292. Defendant's conduct also resulted in Defendant obtaining an unjust and improper benefit by continuing to collect, use, and monetize users' data despite representing that such practices would cease upon declining.

293. Plaintiffs and the Class members seek all available relief for Defendant's fraudulent conduct, including compensatory damages, restitution, disgorgement, punitive damages where available, and injunctive relief to prevent further misrepresentations.

**COUNT VII**
**VIOLATIONS OF NEW YORK'S DECEPTIVE ACTS AND PRACTICES ACT**
**N.Y. Gen. Bus. Law § 349**
**(On Behalf of Plaintiff Forero and the New York Subclass)**

294. Plaintiff Forero incorporates by reference and re-alleges each and every allegation set forth in all preceding paragraphs of this Complaint.

295. N.Y. Gen. Bus. Law ("GBL") § 349 declares unlawful "[d]eceptive … acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

296. Defendant conducts consumer-oriented business and trade, including the operation of its Website, in its advertising and sale of goods in New York, as required by GBL §349.

297. Defendant knowingly violated GBL § 349 by deceptively representing, through its Cookie Banner, that users would not be tracked by cookies if they affirmatively rejected that tracking via its Privacy Settings.

298. Defendant's misrepresentations and partial misrepresentations, including the misrepresentations, omissions, active concealment, and other deceptive conduct described herein, falsely represented that users were provided a particular level of privacy protection and control

over their Sensitive Information, when in fact Defendant continued to collect, disclose, and transmit users' Sensitive Information to Tracking Entities through the Tracking Tools regardless of users' consent.

299. Defendant's misrepresentations and partial misrepresentations, including the misrepresentations, omissions, active concealment, and other deceptive conduct described herein, were directed at consumers, including Plaintiff Forero, visiting Defendant's Website, occurred repeatedly in the course of Defendant's online business practices, and were capable of deceiving a substantial portion of the consuming public with respect to the collection and disclosure of their Sensitive Information.

300. The facts misrepresented, concealed, or not disclosed by Defendant were material in that Plaintiff Forero and the New York Subclass members, and other reasonable consumers, would have considered them in deciding whether and how to interact with Defendant's Website. Had Plaintiff and members of the New York Subclass known that Defendant continued to collect and disclose their Sensitive Information through tracking technologies regardless of users' cookie choices, they would not have visited the Website, would have limited their interactions with it, or would have taken steps to avoid or block such data collection.

301. Defendant alone possessed the information that was material to Plaintiff Forero and the New York Subclass members and failed to disclose such material information to consumers.

302. Defendant has engaged and continues to engage in deceptive conduct in violation of GBL § 349.

303. The misrepresentations and partial misrepresentations, including the misrepresentations, omissions, active concealment, and other deceptive conduct described herein, caused Plaintiff Forero and the New York Subclass members to suffer injury in the form of actual

damages, including the loss of control and value of their Sensitive Information and the unauthorized disclosure of Sensitive Information to Tracking Entities, which they would have avoided had Defendant accurately disclosed its data-collection and tracking practices.

304. Defendant intended for Plaintiff Forero and the New York Subclass members to rely on its misrepresentations and partial misrepresentations, including the misrepresentations, omissions, active concealment, and other deceptive conduct described herein, regarding the nature and extent of its data-collection and tracking practices when deciding whether and how to interact with Defendant's Website, while unaware of the undisclosed material facts.

305. GBL § 349 applies to Plaintiff Forero and the New York Subclass members because the State of New York has an interest in regulating business conduct in New York. Plaintiff Forero is a resident of New York and was in New York when his Sensitive Information was intercepted and disclosed without his consent.

306. Defendant's conduct has caused and is causing immediate and irreparable injury to Plaintiff Forero and the New York Subclass Members. Defendant's conduct will continue to damage both Plaintiff Forero and the New York Subclass members and deceive the public unless enjoined by this Court.

307. As a direct and proximate result of Defendant's violations, Plaintiff Forero, the New York Subclass Members, and other reasonable consumers have been harmed, and that harm will continue unless Defendant is enjoined from continuing to misrepresent and omit the true nature of its data-collection, tracking, and information-sharing practices.

308. Pursuant to GBL § 349(h), Plaintiff Forero and the New York Subclass seek injunctive relief, declaratory relief, actual damages or $50 (whichever is greater), statutory damages of three times the actual damages (up to $1,000), and attorneys' fees.

**COUNT VIII**
**VIOLATIONS OF NEW YORK'S FALSE ADVERTISING LAW**
**N.Y. Gen. Bus. Law § 350**
**(On Behalf of Plaintiff Forero and the New York Subclass)**

309. Plaintiff Forero incorporates by reference and re-alleges each and every allegation set forth in all preceding paragraphs of this Complaint.

310. GBL § 350 prohibits false advertising in the conduct of any business, trade, or commerce.

311. Pursuant to GBL § 350-a, false advertising is defined as "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect . . . [, where 'misleading' refers to] representations made by statement, word, design, . . . or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations."

312. Defendant knew or should have known that its representations regarding users' ability to control the collection, sale, or sharing of their Sensitive Information were false or misleading because the Tracking Tools continued to collect and disclose users' data through the Website regardless of users' consent.

313. Defendant purposely misrepresented, actively concealed, and failed to disclose material facts regarding its data-collection, tracking, and information-sharing practices to consumers, including Plaintiff Forero and the New York Subclass members.

314. The facts misrepresented, concealed, or otherwise undisclosed by Defendant were material in that Plaintiff, the New York Subclass members, and other reasonable consumers would have considered them when deciding whether and how to interact with Defendant's Website. Had Plaintiff Forero and the New York Subclass members known that Defendant continued to collect and disclose their Sensitive Information through Tracking Tools regardless of users' cookie

consent, they would not have visited the Website, would have limited their interactions with it, or would have taken steps to avoid such data collection.

315. Defendant obtained a benefit from Plaintiff Forero and the New York Subclass members by collecting, using, and disclosing their Sensitive Information through Tracking Entities, while depriving them of the ability to control the use and sharing of that Sensitive Information, despite the availability of reasonable alternatives that do not engage in the same deceptive data-collection practices.

316. Defendant's conduct caused Plaintiff Forero and the New York Subclass members to suffer actual damages by depriving them of the ability to make informed choices about the collection and disclosure of their personal information and by subjecting them to unauthorized tracking and data sharing, which they would have avoided had Defendant accurately disclosed its data-collection practices.

317. As a direct and proximate result of Defendant's violations of GBL § 350, Plaintiff Forero and the New York Subclass members have been injured, and that harm will continue unless Defendant is enjoined from continuing to misrepresent and omit the true nature of its data-collection, tracking, and Sensitive Information-sharing practices on the Website.

318. Defendant's conduct has also substantially injured the public, as consumers across the country were exposed to and relied upon Defendant's representations regarding its data-privacy practices while unaware of material omissions—specifically, the failure to disclose that users' personal information was collected, shared, and disclosed to third parties through tracking technologies regardless of users' cookie consent. Defendant's omissions deprived consumers of the ability to make informed decisions about their online privacy and created a false impression

that users' choices meaningfully controlled data collection and sharing, thereby undermining public trust in websites that purport to offer transparency.

319. Defendant's conduct thus caused real-world harm and poses an ongoing risk of further injury if not enjoined.

320. Pursuant to GBL § 350-e, Plaintiff Forero and the New York Subclass seek injunctive relief, declaratory relief, actual damages or $500 (whichever is greater), statutory damages of three times the actual damages (up to $10,000), and attorneys' fees.

**COUNT IX**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Class)**

321. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

322. Plaintiffs bring this cause of action on behalf of themselves and all Class members.

323. Defendant obtained a benefit by collecting, processing, and enabling third-party monetization of Plaintiffs' and the Class members' Sensitive Information, which Defendant then used to increase the effectiveness of advertising, marketing, and sales and to generate revenue.

324. It is unjust that Defendant retains those benefits under circumstances in which the information was collected and transmitted in breach of the representations made to users and without valid consent.

325. Plaintiffs and the Class members conferred these benefits on Defendant, and Defendant has been unjustly enriched at the expense of Plaintiffs and the Class members. Equity and good conscience require restitution or disgorgement of the benefits unjustly retained by Defendant. Therefore, Plaintiffs and the Class members are entitled to the relief set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

a. An order determining that this action is properly brought as a class action and certifying Plaintiffs as the representatives of the Class, the New York Subclass, and the California Subclass and their counsel as Class Counsel, and making all appropriate class management orders;

b. An order finding in favor of Plaintiffs, the Class, the New York Subclass, and the California Subclass, on all counts asserted herein, including:

- An award of statutory damages or penalties to the extent available;
- An award of damages in amounts to be determined by the Court and/or jury;
- An award of pre-judgment interest on all amounts awarded;
- An order of restitution and all other forms of monetary relief;
- An order providing for injunctive, declaratory, punitive, and disgorgement relief as explained herein;
- An award of all reasonable attorneys' fees and costs; and
- Such other and further relief as the Court deems necessary and appropriate.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs demand a trial by jury of all issues so triable.

Dated: October 20, 2026

Respectfully submitted,

By: *<u>/s/ Gary S. Ishimoto</u>*
Gary S. Ishimoto
Mark S. Reich*
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: gishimoto@zlk.com
Email: mreich@zlk.com

*Counsel for Plaintiffs*

**pro hac vice* forthcoming